JAMES G. HARDIN V. STATE OF NEBRASKA.

FILED NOVEMBER 1, 1912.    No. 17,564.

1. Criminal Law: PLEA IN ABATEMENT: QUESTION FOR COURT.  "Where a plea in abatement in a criminal prosecution presents questions of law only, it is proper for the trial court to determine such questions without the intervention of a jury." *Stetter v. State,* 77 Neb. 777.

2. ———: STATUTE: TITLE: "RAILROAD CAR."    The act known as "Senate File 150" (laws 1905, ch. 184) examined, and *held* that the enumeration of buildings contained within section 1 of the act, which includes "railroad car," comes fairly within and is not broader than the title.

3. Burglary: EVIDENCE.    Evidence examined and set out in the opinion, *held* sufficient to establish the *corpus delicti.*

4. ———: INFORMATION.    The information examined and set out in the opinion, *held* sufficient to sustain a conviction for burglary.

5. Criminal Law: EVIDENCE: ADMISSIONS.    The evidence as to alleged admissions made by defendant examined and set out in the

opinion, *held* insufficient to show that the admissions, if made, were obtained under threats.

6. **Burglary: EVIDENCE.** Evidence examined and set out in the opinion, *held* sufficient to sustain the conviction.

ERROR to the district court for Richardson county: JOHN B. RAPER, JUDGE. *Affirmed.*

*James E. Leyda,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

FAWCETT, J.

Defendant was convicted in the district court for Richardson county of the burglary of a railroad car in the yards of the Missouri Pacific Railway Company, in Falls City, and sentenced to a term in the penitentiary of not less than one nor more than ten years. From such conviction he prosecutes error to this court.

Plaintiff in error, who will be designated as defendant, in his brief presents and argues five specific grounds for reversal, which we will consider in the order in which they are presented. Upon the argument at the bar, counsel argued a further ground that the evidence was insufficient to sustain the verdict. This will also be considered in its order. The information charges that defendant "did, on or about the 30th day of July, A. D. 1911, in the county of Richardson and state of Nebraska, aforesaid, then and there being, then and there a railroad car of the Missouri Pacific Railway Company, a corporation duly organized under the laws of the state of Missouri, then and there being, wilfully, maliciously, forcibly, unlawfully, burglariously, and feloniously did break and enter, with intent the goods and chattels in said railroad car contained * * * to steal," etc.

When arraigned, defendant first pleaded not guilty, but later was granted leave to withdraw this plea and file a

plea in abatement, the only allegation in which was: "Because the statute under which said information is brought is invalid, in that it was not properly passed by the legislature which is purported to have enacted it." This plea was overruled, and this ruling forms the basis of defendant's first assignment, viz., "Because there was no trial of the issue presented in the plea in abatement." Under our holding in *Stetter v. State*, 77 Neb. 777, this assignment is without merit. We there held: "Where a plea in abatement in a criminal prosecution presents questions of law only, it is proper for the trial court to determine such questions without the intervention of a jury."

"(2) Because the Daylight Burglary Act is unconstitutional, in that it is broader than its title." The title to the act (Senate File 150, laws 1905, ch. 184) reads: "An act to provide for the punishment of persons guilty of breaking and entering buildings of all characters, with intent to commit any felony, or with intent to steal property of any value, and to repeal sections 48 and 53 of the criminal code of Nebraska, except as to offenses heretofore committed thereunder." Section 1 of the act provides: "If any person shall wilfully, maliciously and forcibly break and enter into any dwelling house, kitchen, smokehouse, * * * station-house or railroad car, with intent to * * * commit any felony, or with intent to steal property of any value, every person so offending shall be punished by imprisonment in the penitentiary," etc. It is now contended that a railroad car is not within the title to the act for the reason that it is not a building; and numerous definitions are cited in support of this contention.

Is the statute under which the prosecution is brought invalid because in violation of the provision of section 11, art. III of the constitution, that "no bill shall contain more than one subject, and the same shall be clearly expressed in its title?" The question is whether the *subject* of legislation is clearly expressed in the title. The subject is defined in the title of the act as "breaking and entering buildings of all characters," with intent to commit felony

or steal.   Breaking and entering a railroad car is not a
different subject for legislation from breaking and enter-
ing a warehouse or other permanent structure.   If it were
a different subject of legislation, that of itself would pre-
vent its being united with that subject in the same act, as
no act can contain more than one subject.   The subject of
legislation is the breaking and entering, with intent to
steal or commit felony.   Is it clearly expressed in the
title?   The argument is that, because the title limits the
subject of legislation to breaking and entering "buildings
of all characters," the breaking and entering of railroad
cars is not included, and therefore the subject of legisla-
tion being extended in the act to cover the breaking and
entering of railroad cars is not clearly expressed in the
title.   The title names the two former sections covering
this subject and repeals them.   In those sections the break-
ing and entering of a railroad car is included.   It is mani-
fest from the title of this act that the purpose was to enact
a new law in place of the old, and to make the title general
and broad.   The words "of all characters" are added to
the word "buildings."   These words would be wholly un-
necessary if it was intended to legislate only in regard to
structures of a permanent character.   Any one considering
this title would necessarily inquire as to the purpose and
force of the added words, "of all characters."   The object
of the constitutional provision in question is to prevent
surreptitious legislation.   It is intended to enable mem-
bers of the legislature, and others interested, to know from
the title of the act the subject of the proposed legislation.
Those interested in defining the crime of breaking and
entering, which was substituted for burglary of the com-
mon law, would understand that the legislation might be
extended to such constructions as were included in the
former acts, and which, when we consider the derivation
of the word "building," are not necessarily excluded by the
use of that term.   The legislature considered this title
sufficient to notify all parties of the subject of the proposed
legislation.   If we adhere to our rule that an act of the

legislature will not be held invalid as violating the constitution unless it is clearly and unavoidably so, I think we must hold that the subject of this legislation is sufficiently expressed in the title.

"(3) Because the *corpus delicti* of the crime was not proven." Defendant contends that there is no proof in the record showing that a crime was committed within the jurisdiction of the court; that is to say, that there is no proof that the car was broken into in Richardson county. The car was sealed in Kansas City, Missouri, which is about 100 miles distant from Falls City, only about four miles of that distance lying within Richardson county. It was sealed in Kansas City July 27, and reached Falls City on the evening of July 29 or the morning of July 30. The evidence of the state shows that, when the car was first observed by the agent of the railroad company, the seal was broken. Hence, it is contended that there is no evidence to show that the seal may not have been broken and the car entered before it reached Falls City. The trouble with this contention is the evidence shows that the only thing taken from the qar was one box of merchandise, which was found in the weeds close to the car, and the testimony of the witness Kendrick, who was a detective in the employ of the railroad company, shows that some time along in the night-following defendant's preliminary examination defendant stated to him that "Sheldon (who .was jointly informed against with defendant) broke the seal with a piece of iron, and Mr. Cantley (another detective in the employ of the railway company) asked him if it was a brake shoe, and he said, 'I believe it was;'" that the witness then asked him, "What was you doing there?" and he said, "I was looking around to see if any one was coming;" that witness then said, "You were looking out, were you?" and he answered, "You can call it what you please." This testimony by the witness Kendrick is assailed upon the ground that, at the time this admission is alleged to have been made, the circumstances under which defendant is alleged to have made the ad-

missions were as follows: During the night following defendant's preliminary hearing the two railroad detectives, Kendrick and Cantley, together with the deputy sheriff and chief of police of Falls City, took defendant from the jail out into the alley between the jail and the courthouse, and there questioned defendant; that it was then that defendant is alleged to have made the admission above referred to. The testimony of Kendrick is contradicted by defendant, who testified that these parties tried to make him admit that he had assisted in breaking into the car in question; that the railroad detective had been drinking; that they had some hot words when he "denounced them as liars and perjurers;" and that the deputy sheriff then took him back to jail and locked him up. Counsel for defendant says: "Cantley is not called as a witness, and McFarland and Aldrich only corroborate Kendrick to a very slight degree." Counsel in his brief claims that the defendant asked that his attorney be called in, but no attention was paid to it, and that the railroad detective began to threaten defendant and thereby obtained from him the admission above referred to. This claim of defendant's counsel is not sustained by the evidence, as given in the abstract prepared by him, beyond the single statement that the detectives and officers referred to "tried to make him admit that he had assisted in breaking into the car in question," but no testimony is given as to any threats, nor are any facts given from which his conclusion is drawn, that they tried to make him admit his participation in the breaking. The jury saw the witnesses upon the stand and heard their testimony, and by their verdict have determined that the breaking occurred in Richardson county. The evidence of Kendrick, which, as counsel says, is corroborated "to a very slight degree" by the witnesses McFarland and Aldrich, would seem to be sufficient to sustain that finding.

"(4) Because the jury found Hardin guilty of burglary; there being no such offense in the Nebraska criminal code." Counsel relies upon *In re McVey*, 50 Neb.

481, where it was held that, "under an information against a person for the crime of burglary, he cannot be convicted of the statutory offense of breaking and entering buildings in the day-time described in section 53 of the criminal code." At the time the opinion in that case was handed down the crime of burglary was covered by section 48 of the criminal code, which limited the breaking and entering to "the night season," and, in order to obtain a conviction under that section, it was necessary to show a breaking and entering in the night-time, while section 53 covered breaking and entering in the day-time, with intent to steal or commit felony, and the court held that, under an information based upon section 48, a party could not be convicted for the offense described in section 53. By the act of 1905, sections 48 and 53 were both repealed, and Senate File No. 150, *supra*, was substituted in lieu thereof; so that the act, as we now have it, covers the breaking and entering at any time whether day or night; the words, "in the night season," having been omitted. The attempted distinction between the terms "burglary" and "breaking and entering" is, in our judgment, entirely too technical. As applied to our present criminal code, it is an attempted distinction without a difference.

"(5) Because the admissions of the defendant to the special agent of the railroad were obtained under threats." This assignment is disposed of by our discussion of assignment No. 3.

This brings us to the contention made at the bar that the verdict is not sustained by the evidence. This contention must also be held adversely to defendant. The evidence shows without question that Sheldon entered the car in the afternoon, and threw the box of merchandise out into the weeds; that during the evening of that day he and Carlson and defendant went together to the place where this box had been thrown by Sheldon; that Sheldon then took some of the property out of the box and carried it away. It is true all three of the witnesses say

that defendant took no part in rifling the box, and it is sought to show that defendant was induced to accompany Sheldon and Carlson to the yards that evening under an intimation that they had some liquor down there. It is also shown that friendly relations existed between defendant and Sheldon, so much so that, after Sheldon was arrested and locked up, defendant took some tobacco and cigarette papers to him; that while there he saw the chief of police, and asked if he could talk to Sheldon; that the chief of police asked him a few questions; that defendant told him where he worked, "and that he had come down with this fellow, meaning Sheldon, and was a friend of his." There is also the testimony of the chief of police that on the evening of July 30 he was called to the Missouri Pacific depot, where he found a box car open and some goods scattered on the ground, including a pasteboard packing box; that he took possession of the box and contents and brought them to the courthouse, including the invoice for the goods, which he checked up and found that there were missing from the box a pair of shoes, a fountain pen, and a set of knives and forks; that he afterwards found the shoes in a room occupied by Sheldon; that some days afterwards he received from one Ridley a set of knives and forks; that on the way to the depot that evening he met Sheldon and Carlson between Seventh and Eighth streets as they were coming uptown, and west of Chase street he met defendant; that it was probably a half a block or more from the car to the point where he met defendant; that when he got to the car the door was open; that he gathered up the stuff, and was starting to get a lunch when he met defendant and two Mexicans; that he stopped them, told them he was a policeman, and that defendant was under arrest. He says: "I told him to come over to me, and he came over, and I saw a box in his pocket, a pasteboard box, about the length of the knives in question." That he took the box out of defendant's pocket and shook it, told him he was under arrest and for him to stand there; that he put

the box back into defendant's pocket, "and told him to line up with the others, three or four fellows and two Mexicans and the boys who had informed him of the car being opened. That as they lined up it was dark and they couldn't see, and Mr. Hardin (defendant) stepped back of him, and when he looked back he couldn't see him, and that he looked over and saw him go at the south end of the coal shed. That was the last he saw of him that night."

The evidence as to defendant's participation in the burglary of the car, outside of his alleged admission to the witness Kendrick, is not conclusive nor very satisfactory, but, when taken in connection with the admission testified to by Kendrick, corroborated to some extent at least, as conceded, by the witnesses McFarland and Aldrich, we think it was sufficient to sustain the verdict.

Upon consideration of the whole case, we feel that the defendant is probably guilty. The jury who heard the testimony and saw the witnesses have so found. The learned trial court, who also had the advantage of observation, which is denied to us, sustained the verdict. Under these circumstances, the judgment of the district court must be, and it is,

AFFIRMED.

REESE, C. J., dissenting.

I have read the evidence in this case, and am of the opinion that it falls far short of proving plaintiff in error guilty of any crime.

LETTON, J., dissenting.

Section 251, criminal code, provides: "This code and every other law upon the subject of crime which may be enacted shall be construed according to the plain import of the language in which it is written, * * * and no person shall be punished for an offense which is not made penal by the plain import of the words, upon pretense that he has offended against its spirit." To call a rail-

road car of any description a building is certainly an unusual use of that term. The word "building," if construed according to its plain import, as the statute requires, would not include an inclosed railway car; because I think no lexicographer has included any type of vehicle within the meaning of the word "building." Suppose that the legislature in the same act had included carriages, street railway cars, hacks, closed delivery wagons, and automobiles with inclosed bodies, would we say that these came properly within the term "building"? The legislature evidently made an oversight. We cannot make a new definition for the word "building" in order to remedy this omission.

HAMER, J., dissenting.

I have carefully read all the evidence. There are 156 pages in the bill of exceptions besides the exhibits. After a careful consideration of the testimony, I do not find it sufficient to sustain a verdict. To understand the evidence, it is necessary to quote from the testimony.

L. L. Aldrich, the chief of police, testified to finding a box car open and goods taken out and scattered around. A pasteboard box about 2½ feet long by 15 to 18 inches wide was found broken open in the weeds close by the car. There were packages of tea and other articles in the neighborhood of the box. There was an invoice bill, "Exhibit A." When the goods were checked up according to this invoice bill, there was a shortage. The things gone were shoes, a fountain pen, and a set of knives and forks. There was a railroad bill accompanying the bill of lading. The chief of police and his assistant found shoes in the City Hotel. They were in the room occupied by Thomas Sheldon. There was a shoe box and fountain pen and a corset cover, ten boxes of tea, and other articles. When going down to the car Aldrich met "Tom Sheldon and Carlson coming up between Seventh and Eighth streets on Stone street." He testified, "As I came down

west on Chase and Seventh, I met Mr. Hardin," the defendant. Aldrich testified that Hardin was talking to a couple of Mexicans. It was 20 or 30 minutes after nine. When Aldrich first met Hardin, Hardin was going away from the direction of the car, and was not nearer to the car than half a block or more. He was then on the sidewalk. The car that had been opened was "right north of the west end of the depot," and 50 feet or more from the depot on the north side. It was on the north track nearest the tank. On the east side of the tank there is an embankment. The door of the car was open when Aldrich arrived. The car which was open was next to the north track. There were no dwellings north or east of the car until one got on the hill. East of there are the Mausts coal sheds. Aldrich told the defendant, who was then talking with the Mexicans, that he was a policeman, and to come to him. There was a pasteboard box in the defendant's pocket that had a heavy cord tied around it. Three or four men and two Mexicans were there, also the boys who told Aldrich of the car being opened. Aldrich testified that Hardin stepped back of him, that when he looked back he could not see Hardin, and when he asked where the other man was Hardin said "over there," and when Aldrich went over he found the Mexicans still there, but Hardin had gone over the south end of the coal sheds, and Aldrich saw him no more that night. East and southeast of the car were some cars and Gillespie's boarding house. There were some knives and forks which were gotten from Joe Ridley who was arrested by Aldrich. After this the defendant was arrested by Aldrich at the Missouri Pacific shops Friday afternoon. On cross-examination Aldrich testified that it might have been a block away from the car where he met the defendant; that there was no attempt to steal the stuff taken from the car; that the defendant came up afterwards to where Aldrich was at work; that the defendant went back to where Aldrich was when Aldrich was looking at the stuff; that there were seven or eight people around there; that

the defendant was not trying to run away; that he went to Gillespie's boarding house and searched the defendant's room. From the depot to the Missouri Pacific shops is a good half mile. Aldrich arrested Sheldon at the northeast corner of Fifteenth and Stone streets, about ten blocks from the depot. He arrested Carlson at John Wilson's. Aldrich did not know whether the car was broken open where it stood, or whether it was open when it came into Falls City, and did not know that the car had been broken by any of the defendants. There were with Aldrich at the car Rice McDonald, Frank Gamblin, two Mexicans, and two boys who called him down to the depot.

Joseph Ridley, a locomotive fireman, testified that when he went to get his engine that morning, and at just about the middle of the stockyards, he saw and picked up a little box containing a set of silver knives and forks. It was southeast of the Missouri Pacific depot, the direction in which the stockyards lay and where the road ran.

R. R. McNulty testified that the defendant was drunk that night; that the defendant was out in the mudhole and staggered around; that the defendant walked up to where the men were near the car that was open, and then staggered into the mudhole. It does not seem likely he would have done this if he had been guilty.

James Kendrick, the detective in the service of the railroad company, testified in a way that was unsatisfactory. He could not remember whether he was sworn at the preliminary. He seemed to have so many cases on hand that he got confused. There were three cases—Hardin, Sheldon, and Carlson. He could not remember whether he had talked with the defendant. He was not certain of anything, except that the defendant told him that he had been in the penitentiary. He was not sure what he had testified to before; and he might have testified that the defendant told him that he saw the seal broken, and then he might not. He denied testifying at the preliminary examination that the defendant had told him that "these

parties were down there; the three of them were down there together, and he started off while they broke the car, and Sheldon jumped in and took the box out, and he saw them taken out to the head of the weeds." Possibly this witness testified to that, but he did not remember whether he did or not; also he didn't remember whether he was at Judge Spraggen's court when they were trying Sheldon; but, when asked if he was there at the time they tried Carlson, he testified: "The chances are I was." When asked whether he tried to get the defendant to waive his preliminary examination, he didn't remember whether he did or not. He finally denied that he had any talk with him personally, and said his talk was with a Mr. Cantley. He could not remember the words used by Mr. Hardin at the preliminary hearing. When asked if he had not testified that the defendant said he was down there with these two people, that he met them down there, that he was standing down there, and that they went to the car and took these boxes and hid them in the weeds, he said he did not remember anything at all about it. When he was further asked about the matter he said: "I disremember the proceedings down there."

One Ruezsegger testified that he was the clerk at Kansas City, but would not undertake to say where the seal of the car was broken; that the car would stop at several points between Kansas City and Falls City.

Dennis O'Connell, the seal clerk, testified that he did not know whether the car had been in the Kansas City yards.

L. L. Aldrich was recalled as a witness for the state, and testified that the defendant said that he was there when the car was opened, and that Tom Sheldon broke the seal; and he also testified that the defendant said that Tom Sheldon took the goods out of the car.

James McFarland testified that the defendant told him that he did not break into the car, but that Sheldon broke into the car.

Thomas Sheldon testified as a witness for the defendant

that he was one of the defendants informed against along with Albert Carlson, and that he had entered a plea of guilty to the charge made against him, that of breaking and entering into this same box car, and that he saw Hardin about 7 o'clock in the evening, which was the first time that he had seen him on that day, and that the car was open when he first saw it; that he took the box and threw it down in the weeds; that Hardin saw the box out there in the weeds, and that that was the first time Hardin had seen it to the best of his knowledge; that Hardin had nothing whatever to do with breaking the car; that he, Sheldon, found the car open at 3 o'clock in the afternoon. And on cross-examination Sheldon testified that Carlson went down with him to the train that afternoon, and that Carlson took the goods out of the car, and that the defendant was not there in the afternoon; that he, Sheldon, and Carlson went down to the car and got the box and threw it in the weeds, and that they did not meet Hardin until 7:30 that night; that he, Sheldon, took the shoes that night, and with Carlson and Hardin went through the box that night, but this was after he had taken the box and had thrown it in the weeds; that when he went up town Carlson went with him; that he met Hardin at Rawlings, Wyoming, and that he after-wards met Hardin in Omaha just before coming to Falls City.

Albert Carlson testified that he and Tom Sheldon went down to the depot about 2 o'clock in the afternoon, and that Hardin was not with them, and they did not see Hardin until 7 or 8 o'clock that evening; that he (Carlson) and Hardin did not take anything from the box; that they went up town and Hardin went home; that Tom Sheldon went into the car and told him he was looking for a fine suit of clothes, and that when the stuff was taken out of the car Hardin "was not around there at all."

O. S. Larson testified that he was the gang foreman at the Pacific shops, and that the defendant worked for

him; that he ran a drill press, and that Hardin worked at the shop on the Sunday before the day of his arrest, and that he worked there all day. His testimony corroborates the testimony of Larson and Sheldon that Hardin had nothing to do with the crime of breaking into the car.

S. A. Moore testified to the same thing—that Hardin operated a drill press and worked that Sunday and up to the day of his arrest, that he worked all that Sunday in the Missouri Pacific shops.

The defendant Hardin testified, that he boarded at Gillespie's hotel; that he met Sheldon that night on Stone street, and that Carlson told him that "he had some stuff planted and he wanted to go and get it;" that he met Sheldon and tried to get Sheldon to pay him $5 that he owed him; that Sheldon said, "Come on, let's go down to the depot, I got some shoes down there;" that when they got down to the depot they were still arguing about the $5, and that Sheldon turned off and went down the track and went over in the weeds and got a box and broke it open; that Carlson told him not to do that; that they were not going to have anything to do with it; that he saw Sheldon put the shoes in his bosom, and that they then went to the Gillespie hotel; that he did not take any of the stuff down at the depot; that he did not stand guard there; that it was Sunday evening, and they all had their coats on; that Cantley was the drunkest; that Cantley put his leg on his and leaned over onto him, and promised that he would see the master mechanic and would see that he did not lose his job.

The defendant admitted being in the penitentiary in Wyoming for passing a fraudulent check. He seems also to have been in the penitentiary in Texas because of a shooting case, and he testified that he proved by several witnesses that the man in Texas shot the first shot at him, and that he then shot in self-defense. He was a bookkeeper in the penitentiary in Wyoming, and received his pardon for good conduct.

We think that it clearly appears from the evidence that the defendant had nothing to do with the breaking. He was not down to the depot that afternoon according to the weight of the testimony, and he had nothing whatever to do with the breaking into the car. That he is innocent of the crime charged seems to be established by the uncontroverted evidence of Larson and Moore; and their testimony corroborates the testimony of Carlson and Sheldon. The defendant may not be a good citizen, but he should not be convicted and sent to the penitentiary unless he is guilty of the crime charged against him.