C. C. SHOPE, Appellant, v. CITY OF DES MOINES et al., Appellees.

**BRIDGES:** Determining Approaches and Improving and Paying Therefor. Necessary approaches to a bridge are a part of the main bridge structure, and the determination of the extent thereof, as primarily fixed by the body which determines the extent of the bridge proper, is attended by a strong presumption of correctness. As the bridge proper and approaches constitute a unit, the entire cost, including paving, sidewalking, and grading of incoming side streets, is payable from the bridge fund, even though such paving, sidewalks, and grading, if constructed without being a part of a bridge, would be paid for by special assessments. (So held under Sec. 758-d, Code Supp., 1913.)

*Appeal from Polk District Court.*—HUBERT UTTERBACK,
Judge.

APRIL 13, 1920.

SUIT to restrain the city of Des Moines and its officers
from appropriating funds derived from bridge bonds to
meet the expenses of grading, curbing, paving, and build-
ing sidewalks on streets near to and approaching Univer-
sity Avenue Bridge from the east. On hearing, temporary
injunction was denied, and plaintiffs appeal.—*Affirmed.*

*Lappen & Carlson,* for appellant.

*F. T. Van Liew, E. J. Frisk, H. W. Byers, Reson Jones,
C. A. Weaver, Paul Hewitt,* and *E. J. Kelly,* for appellees.

LADD, J.—I. In June, 1917, the city of Des Moines,
through its officers, entered into a contract with William
Horrabin for the construction of the bridge over the Des
Moines River, known as the University Avenue Bridge.
The structure is in six spans, extending from Station 20
plus 42 at the east abutment of the bridge, west 887 feet
to Station 12 plus 55, "from which point an earth fill shall
be constructed to the interurban tracks, said earth fill to
commence at Station 12 plus 55 and continue thence west
on a uniform grade as shown on plans, which grade shall
be the same as that shown for the viaduct structure (over
the Chicago & Northwestern Railway Company tracks).
The above price ($335,800) includes the construction of a
retaining wall, as shown on Sheet No. 10, and the stairway.
as shown on Sheet No. 2 of the plans, and paving and
sidewalks over the fill above described to the interurban
tracks." Following this is a schedule of prices, and this
clause:

"The west approach of the bridge shall begin at a point
392 feet east of the center line of Bluff Street, which point

is immediately east of the tracks of the Interurban Railway, upon and along the center line of University Avenue in the city of Des Moines, Iowa, as shown upon the accompanying plan, and shall terminate at the west line of Penn Avenue. The grade of the bridge and approaches shall be a true uniform line, beginning at an elevation of 20.00 at the interurban track, and terminating at an elevation of 88.00 at the center line of East Seventh Street, which grade is approximately 3.30 per cent. Thence to the west line of Penn Avenue, to an elevation of 98.00 on a grade of 2 per cent.

"(1-b) Work Contemplated: The work shall comprise the complete construction of the bridge proper, together with all excavation and filling of approaches thereto, lying between the Interurban Railway and Penn Avenue, and the approaches in East Seventh Street between Fremont Street and Parnell Avenue. It shall include the construction or reconstruction of any pavements now in place in the streets to be constructed. The character of pavements to be determined by city council. The design of the bridge shall provide, at a suitable point near the boulevard site on the west bank of the river, a suitable and approved type of ramp, or inclined adit, for pedestrian use only, from the ground level to the floor of the bridge proper."

Money for the construction of the bridge was raised by the issuance of bonds, amounting to $400,000. This was authorized by Section 758-d of the Code Supplement, 1913, which reads, in part:

"That cities of the first class are hereby authorized to contract indebtedness and to issue bonds for the purpose of constructing bridges."

In pursuance of the authority so conferred, an ordinance was adopted by the city, providing "for the purpose of procuring necessary funds to pay for the cost of the

construction of the University Avenue bridge and viaduct in accordance with the terms of the contract.therefor."

It is to be observed that both the statute and ordi-nance limit the purpose for which bonds were issued and funds raised for the construction of the bridge, and our first inquiry is whether the improvements east of the bridge, included in the contract, and for which schedule prices were to be paid, constituted a part of the bridge. The courts quite generally hold that, if an approach is es-sential, to enable persons to reach the main structure, and thereby pass over the stream, and that without it the main structure would have been incomplete and useless as a bridge, such an approach may be found a part of the bridge. In this state, whether an approach is a part of the bridge is held to be an issue of fact. *Moreland v. Mitchell County,* 40 Iowa 394; *Nims v. Boone County,* 66 Iowa 272; *Sewing v. Harrison County,* 156 Iowa 229. In some jurisdictions, the issue is regarded as one of law. *Savannah, F. & W. R. Co. v. Daniels,* 90 Ga. 608 (20 L. R. A. 416), and note. In a case like this, the determination is for the officers of the city having power to act,—ultimately, the city council. That body, as seen, was authorized to construct bridges over the Des Moines River, and to issue bonds out of which to pro-cure money to meet the expenses in so doing. Necessarily, to perform this duty efficiently, it must have ascertained then precisely what would be included in the bridge to be constructed. The test by which to determine whether an approach is a part of the bridge lies in determining whether it is essential to enable travelers to reach the main struc-ture, and thereby pass over the stream, and whether, with-out it, such structure would be incomplete and useless as a bridge. In *Moreland v. Mitchell County,* 40 Iowa 394, the court, speaking through Miller, J., said:

"The main structure, as it is called, being that part which spans the river, would be incomplete as a bridge

without the so-called approaches.   It would be utterly useless as a bridge, because totally inaccessible without the approaches, which are, in fact, a prolongation of the bridge, to enable persons traveling on the highway to cross the river on the bridge.   Without the approaches, connecting the highway with the main structure of the bridge, the traveling public would be in the situation of the petitioners for a certain road, in a sister state, which was intended to cross, and a portion of which lay on each side of, a river. They applied, in the same connection, for license to establish and operate a ferry across the river, connecting the two portions of the proposed road.   The county court, having jurisdiction of both subjects, granted the ferry license, but refused to establish the road.   So, if the county authorities had merely constructed the main structure of the bridge, without any provision or arrangement being made for erecting what is called the approaches, they would have acted as foolishly as did the functionary who established the ferry, but refused the application for the road; and it is very clear that it would have been the duty of the county, in constructing the bridge in this case, to also construct the approaches, as parts thereof."

See *Eginoire v. Union County*, 112 Iowa 558, and other decisions too numerous for citation.   These decisions are in harmony with those in other states.

"The term, a bridge," as was said in *Board of Freeholders of Sussex County v. Strader*, 3 Harrison (N. J. L.) 108 (35 Am. Dec. 530), "conveys to my mind the idea of a passageway, by which travelers and others are enabled to pass safely over streams or other obstructions.   A structure of stone or wood which spans the width of a stream, but is wholly inaccessible at either end (whatever it may be in architecture), does not meet my ideas of what is meant, in law and common parlance, by a bridge.   Sound policy, moreover, requires that we so consider the law as to

compel those persons who erect the structure itself to make it accessible at its ends. It is then that an available passageway will be obtained for the public, when the body of the bridge itself is completed."

In *City of Chicago v. Pittsburgh, Ft. W. & C. R. Co.,* 247 Ill. 319 (93 N. E. 307), the court, speaking through Carter, J., observed that:

"Under the common law, and generally under the statutes in this country, a bridge includes the abutments and such approaches as will make it accessible and convenient for public travel. It has been held in some cases that whether a particular bridge includes approaches depends on the circumstances in which the word 'bridge' is used. (*State v. Illinois Central Railroad Co.,* 246 Ill. 188, 286). What is true as to a bridge and its approaches is equally true of a viaduct and its approaches. Ordinarily, an 'approach,' as that term is used, is considered a part of the viaduct. What would be regarded as approaches would depend largely upon the demands of the traveling public, and 'upon what would be reasonable under the circumstances and local situation in each case.' "

See, also, *Wilson v. Barnstead,* 74 N. H. 78 (65 Atl. 298), where it was said:

"The location of the particular lines which, in a given case, separate a bridge from the other parts of the highway of which it forms a part obviously depends upon the plan of its construction. Such location will differ as bridges differ in plans of construction. It is the duty of the court to construe the statute, and determine what is the meaning of the term 'bridge,' there used; but it is purely a question of fact whether a particular part of the way is upon the bridge, within the meaning of the term thus defined. In this case, there was evidence from which impartial men might reasonably find that the defect in question was a defect in the bridge, within the true meaning of the terms

as used in the statute.  No question is or can reasonably be made but that the difference in the levels of the planking and the header appertained to the bridge."

As stated, the grade from the interurban tracks west of the bridge, an elevation of 20.00, to the center line of East Seventh Street, at an elevation of 88.00, is approximately 3.30 per cent, and thence to the west line of Pennsylvania Avenue, at an elevation of 98.00, the grade is 2 per cent.  At the east abutment of the bridge, Station 20 plus 42, a cut of 12 feet was required to reach the bridge.  This cut extended eastward to East Seventh Street, where the cut was 7 feet below the surface of the street as it previously existed, and the cut extended to the surface at the west line of Pennsylvania Avenue.  The cut in University Avenue necessitated the cut north and south therefrom, and the surface appears to have been reached at Parnell and Fremont Avenues.  This recital leaves no doubt that it was open for the city council to decide whether these cuts were essential to the making of a passageway over the river. The facts were for that body to determine.  The statute conferred the power to construct the bridge, and incident to that power was that of determining, in so far as there might be controversy, the extent and nature of the approach required.  In other words, it was for the engineers, in preparing the plans and specifications, and ultimately for the city council, to determine what would be included in the bridge, and this must have been done in the orderly course of business, before directing its construction and providing for the payment of its cost by the issuance and sale of bonds and letting the contract on advertisement of bids.  The record before us does not tend in any manner to impeach the finding of the city council.  That cutting down East University Avenue and East Seventh Street was essential to render the main structure accessible seems beyond controversy.  At any rate, appellants have not met or

overcome the presumption prevailing in support of the findings of the city council.

The only doubt, if any, then, is whether the cut was not more extensive than was required to afford reasonably convenient access to the main structure, and thereby secure a complete passageway over the river; but, as this at most is only a doubt, it was for the determination of the city, and its conclusion ought not to be disturbed by the courts. Having found the reduction of portions of these streets to grade conformably with that of the main structure essential to its reasonable usage as a passageway over the stream, and therefore to constitute a part of the bridge, it was competent for the city council to contract what manner of approach there should be, whether paved as the main structure, or other kind of surface, width, and the like: that is, its authority would be as complete with reference to the approach as it was to the portion of the bridge resting on piers. This is not obviated by the circumstance that the system of paying for street improvements by assessment of benefits against abutting property is and has been in vogue for many years, nor because the cost of improvements near other bridges has been assessed against abutting property. It is enough that the city was authorized to make use of funds raised by the issuance of bonds for the construction of this bridge, and that the pavement here contemplated constituted a part thereof.

We are not concerned with the contracts entered into by the city with the citizens, adjusting claims made for damages consequent on change of grades by improvements of abutting property. The record is such that it cannot be said, as a matter of law, that any portion of the excavation of East University Avenue or of East Seventh Street, or the improvements placed thereon, was unnecessary for the convenient approach to the main structure over the river.

or that the approach was not essential to the use of the structure spanning the river.

II. Appellants argue that the approach might not extend more than 300 feet east from the east end of the structure. By the common law of England, the inhabitants of a county were required to keep in repair public bridges, and also the approaches thereto for a space of 300 feet. See *Rex v. West Riding*, 7 East 588, where Lord Ellenborough said:

"I consider it as having been laid down long ago, by Lord Coke, that the 300 feet of highway at the ends of the bridge are to be taken as part of the bridge itself, being, in the nature of the thing, intimately connected with it, and the exact limits difficult, in some cases, to be ascertained from the continuation of arches beyond the sides of the river. The statute of Henry VIII meant to define the limit, which, perhaps, was uncertain at common law; but the statute still proceeds upon the assumption that there existed a common-law liability for the county to repair the highways at the ends of the bridge, as well as the bridge itself, as appendages to it."

Again, it was said, after citing and commenting upon some authorities, and particularly a case in the time of Edward III:

"From this case it is clear that, in those days, the charge of repairing the highways at the ends of a bridge was considered as belonging *prima facie* to the party charged with the repair of the bridge itself. And the statute of Henry VIII may be considered as having specified the distance of 300 feet from the ends of bridges, for the purpose of reducing to more convenient certainty what should, in all cases thereafter, be considered as the extent and limit of this charge upon the county."

In this country, neither the extent of the approach nor the distance from the ends of the main structure within

which the county shall repair, has been defined. No arbitrary rule exists, and it is quite generally held that the limit is the line indicating the end of the approach on the highway of which it forms a part. See *Wilson v. Barnstead,* supra; *City of Chicago v. Pittsburgh, Ft. W. & C. R. Co.,* 247 Ill. 319 (139 Am. St. 329); *Board of Com. of Huntington County v. Huffman,* 134 Ind. 1 (31 N. E. 570); *Tinkham v. Town of Stockbridge,* 64 Vt. 480 (24 Atl. 761); *Brown County v. Keya Paha County,* 88 Nebr. 117 (Ann. Cas. 1912B, at page 790, and note).

The record does not disclose any misuse of the bridge fund, past or threatened, and the decree dismissing the petition has our approval.—*Affirmed.*

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.