[No. 27375. *En Banc.* November 28, 1938.]

THE STATE OF WASHINGTON, *on the Relation of the Washington Toll Bridge Authority et al., Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent,* F. BRONEMANN *et al., Interveners.*[1]

[1]Reported in 84 P. (2d) 688.

The *Attorney General*, *L. C. Brodbeck* and *John E. Belcher, Assistants,* for relators.

*E. W. Anderson,* for respondent.

*Patrick Henry Winston,* for interveners.

*Bausman, Oldham, Jarvis & Wampold, amicus curiae.*

SIMPSON, J.—This is an original mandamus action instituted by the Washington toll bridge authority and the director of highways for a writ of mandate to compel the state auditor to audit and approve certain vouchers authenticated by the authority and the director of highways, and to issue warrants for the amounts of the vouchers in payment of services performed in making the preliminary plans and survey for a project known as the Lake Washington toll bridge.

Subsequent to the filing of the petition, interveners were allowed by the court to intervene and to file an additional petition for a writ of mandate.

The pertinent portions of the petitions for the writ are as follows: That the Washington toll bridge authority, composed of the governor, state auditor, director of public service, director of highways, and director of finance, business and budget, acting under the authority of Laws of 1937 chapter 173, p. 654 (Rem. Rev. Stat., Vol. 7A, §§ 6524-1 to 6524-21 [P. C. §§ 2697-501 to 2697-521]), by resolution adopted a plan for the

financing, construction, and operation of a toll bridge over Lake Washington, together with approaches and appurtenances thereto, subject to the approval of, and in conjunction with, the public works administration of the United States.

It was further alleged that, in order to determine the necessity, advantage, and practicability of establishing and constructing the toll bridge and to obtain information and data for the consideration of the authority with respect to the toll bridge and approaches, the authority authorized the director of highways to make reasonable examination and investigation, including location tests and preliminary bridge and approach plans; that the authority, by resolution dated October 14, 1938, adopted a plan for the route and character of the toll bridge.

It was further stated in the petitions that L. V. Murrow, director of highways, in compliance with the adopted plan and resolution of the authority, employed interveners to make test borings; one was made at the west foundation of an overhead crossing to be constructed as part of the bridge approach four hundred fifty feet west of Rainier avenue, another was made in connection with the tunnel approach to the bridge at a point west of Yakima avenue, and a third boring was made in connection with the construction of an overhead crossing as part of the approaches appurtenant to the bridge crossing Mercer slough; and that the state auditor refused to audit and approve the vouchers, and to issue warrants for the work.

In his return, the state auditor admitted his refusal to audit and approve the vouchers, and to issue warrants in payment thereof. He gave as his reason that the work performed at the stated locations was so far removed from the projected bridge, both in physical distance and intrinsic characteristics, as to form no

part of the bridge structures proper or approaches thereto within the meaning of Laws of 1937, chapter 173. Respondent does not question the fact that the services have been performed by interveners, or the power of the toll bridge authority to construct toll bridges.

The description of the project consists of a concrete pontoon bridge in Lake Washington from the vicinity south of Leschi, in the city of Seattle, to the northwestern part of Mercer Island.

To the west of such pontoon structure, there is provided an incline transition fixed span leading to the vicinity of the intersection of Thirty-fifth avenue south and Day street, in the city of Seattle, at an established grade. Here the land to the west arises abruptly comprising a high hill, and there is here provided a twin bore tunnel extending from its east portal at a point west of Thirty-fifth avenue south, a distance of 1,446 feet to its west portal at a point just west of Yakima avenue. The route then proceeds westerly crossing over Twenty-seventh avenue south by means of a reinforced concrete structure with connecting road approaches provided. At Twenty-fourth avenue south, there is provided a reinforced concrete structure for carrying pedestrian traffic over this route and thence this route proceeds crossing under Twenty-third avenue south, for which crossing an overhead reinforced concrete structure is provided, from whence the route proceeds crossing over Twentieth avenue south, Rainier avenue, and Poplar place, by means of a reinforced concrete structure, to the intersection of Corwin place and Seventeenth avenue south, at which point approach connections are made at the west end of the approach project with Rainier avenue, which has been designated by the director of highways as forming a part of the route of a primary state highway

(primary state highway No. 2) through the city of Seattle.

To the east of such pontoon structure, there is provided an incline transition fixed span leading to an established grade elevation on Mercer Island, such fixed incline span crossing over Navy Yard boulevard. The route easterly then crosses over Mercer street by means of a reinforced concrete structure and proceeds to cross under Mercer Island boulevard and Summit avenue, for each of which crossings, reinforced concrete overhead structures are provided. The route then crosses over Thompson avenue and other local roads, thence over two local roads, each such crossings being accomplished by means of a reinforced concrete structure. From here, the route crosses under One-hundredth avenue southeast, for which crossing an overhead reinforced concrete structure is provided, from whence it proceeds to and across the east channel between Mercer Island and the east shore of Lake Washington by means of a fixed span bridge, thence to and across Mercer slough on a reinforced concrete causeway structure crossing over an existing county road, and thence, by means of a reinforced concrete structure, crossing over and making connections by lateral approaches with secondary state highway No. 2-A, in King county.

Throughout the bridge and approach project, where grade crossing separation structures are provided lateral connections for local traffic access to the adopted location and route are provided.

The approximate cost of the entire project will be $8,432,000; $3,750,000 will be the cost of the two bridges, and the remainder will be expended in the construction of arterial approaches. The whole undertaking will be financed by an appropriation from the Federal emergency administration of public works of

the United States and the issuance and sale of bonds. Tolls will be collected only from those who travel over the bridges.

The only proposition presented is whether the tunnel and other structures situated a considerable distance from the bridge are approaches within the purview of the toll bridge authority act.

██ ██ That act, Laws of 1937, chapter 173, p. 654 (Rem. Rev. Stat., Vol. 7-A, §§ 6524-1 to 6524-21), vests the authority with the definite powers and broad discretion in the construction of toll bridges and their approaches, and is comprehensive in scope.

The act, in defining the powers and duties of the authority, states:

§ 6524-3 [P. C. § 2697-503]. "The Washington Toll Bridge Authority is empowered, in accordance with the provisions of this act, to provide for the *establishing and constructing of toll bridges upon any public highways of this state together with approaches thereto wherever the same is considered necessary or advantageous* and practicable for crossing any stream, body of water, gulch, navigable water, swamp or other topographical formation whether the same is within this state or constitutes a boundary between this state and an adjoining state or country. *The necessity or advantage and practicability of any such toll bridge shall be determined by the Washington Toll Bridge Authority* and the feasibility of financing any toll bridge in the manner provided by this act shall be a primary consideration and determined according to the best judgment of the Washington Toll Bridge Authority. For the purpose of obtaining information for the consideration of the authority upon the construction of any toll bridge or any other matters pertaining thereto it shall be the duty of any cognizant officer or employee of the state upon the request of the authority to make reasonable examination, investigation, survey or reconnaissance for the determination of material facts pertaining thereto and report the same to the authority. The cost of any such examination, in-

vestigation, survey or reconnaissance shall be borne by the department or office conducting the same from the funds provided for such department or office for its usual functions." (Italics ours.) Laws of 1937, p. 656, § 3.

§ 6524-4 [P. C. § 2697-505]. "In the event that the Washington Toll Bridge Authority should determine that any toll bridge should be constructed under its authority it shall authorize and direct the director of highways to construct such toll bridge. In the event the director of highways is authorized and directed to construct such toll bridge all cost thereof including right of way, survey and engineering shall be paid out of any funds available for payment of the cost of such toll bridge under this act." Laws of 1937, p. 657, § 4.

As indicative of the discretion lodged in the authority, § 6524-11 [P. C. § 2697-512] provides:

"Before the director of highways shall proceed with any action to secure right of way or with construction of any toll bridge under the provisions of this act the Washington Toll Bridge Authority shall have first passed a resolution that public interest and necessity require the acquisition of right of way for and the construction of such toll bridge. Such resolution shall be conclusive evidence (a) of the public necessity of such construction; (b) that such property is necessary therefor and, (c) that such proposed construction is planned or located in a manner which will be most compatible with the greatest public good and the least private injury . . ." Laws of 1937, p. 662, § 11.

In addition, it is provided by Laws of 1937, chapter 173, p. 672, § 17, as follows:

"The Washington Toll Bridge Authority, the officials thereof and all state officials are empowered to do such acts and make such agreements not inconsistent with law as may be necessary or desirable in connection with the duties and powers conferred upon them respectively by law regarding the construction, maintenance, operation and insurance of such toll bridges . . ."

There is no question of bad faith in this action; thus, it remains only to consider whether the authority abused its discretion in the determination of the meaning and extent of the approaches.

The project proposed by the authority is of greater magnitude than any of its kind ever contemplated by the state of Washington or any of its political subdivisions. In considering the question presented, we must view the project as a whole and ascertain the purpose sought to be accomplished. The structure will be an integral part of a great arterial highway leading from the metropolis of this state to the eastern agricultural, mining, and lumber sections. From the east will come hay, grain, lumber, fruit, vegetables, and many other products of the inland empire. From the city of Seattle, manufactured products and supplies of innumerable kinds will be transported across the bridge to the east. Our ever-increasing number of tourists will travel both ways.

It must be borne in mind that the bridge will be a toll bridge, and in order to attract and divert the great highway commerce over the bridge, it is essential that the channels of travel be made readily accessible to the bridge users. It is not only proper, but also very necessary, to extend the arterial bridge approaches to encourage the flow of traffic to and over the bridge. The authority evidently had this situation in mind when it planned the bridge and its arterial approaches so as to route the traffic to and over the bridge from each direction.

The general rule defining the meaning of approaches is concisely stated in 11 C. J. S. 984, § 1, as follows:

"An 'approach' has been defined as an access or a way, passage, or avenue by which a place may be approached, from an engineering standpoint the 'approaches' to a bridge comprise the necessary traffic arteries and adjustment thereof, to develop its maxi-

mum traffic capacity, and it has been judicially declared that the approaches to a bridge comprise the traffic arteries leading to the ends of the bridge proper and such adjustment of the alignments and grades of such arteries in the immediate vicinity of such ends as is necessary to afford the maximum convenience of access and render available to the public the entire capacity of the bridge proper. However, what would be regarded as approaches would depend largely upon the demands of the traveling public and upon what would be reasonable under the circumstances and local situation in each case, and the determination of the question of how much of the embankment constitutes the approach, so as to be a part of the bridge, is generally a question for the jury. The question, it has been said, is more one of fact than of law."

9 C. J. 460, § 52, has the following to say concerning the definition of bridge approaches:

"The difficult point is the determination of what constitutes an approach as distinguished from the highway generally, which point, in the absence of definite expression, must be determined by a consideration of what is reasonable under the circumstances of the particular case, and not on any arbitrary rules relative to the distance from the bridge structure."

In considering the meaning of the term "approaches," we are mindful of the extent of the project and the results sought to be obtained by the authority.

Cases from other courts have been cited bearing upon the question before us; and while many definitions of approaches may be found in which that term has a very limited meaning, they are not helpful in considering modern bridge projects designed to care for the ever-increasing volume of traffic present upon our highways.

Some courts are committed to the rule that the determination of what constitutes an approach to a bridge is a question of law; others consider it a question of fact.

Having in mind the different situations facing the builders of bridges, and the varying demands of traffic, this court adopted the rule that the determination of what constitutes an approach is a question of fact as well as of law. *Rumsey v. Department of Labor & Industries,* 192 Wash. 538, 74 P. (2d) 214.

"The courts quite generally hold that, if an approach is essential, to enable persons to reach the main structure, and thereby pass over the stream, and that without it the main structure would have been incomplete and useless as a bridge, such an approach may be found a part of the bridge." *Shope v. Des Moines,* 188 Iowa 1141, 177 N. W. 79.

What would be regarded as approaches would depend largely upon the demands of the traveling public and upon what would be reasonable under the circumstances and the local situation in each case. *State v. Illinois Central R. Co.,* 246 Ill. 188, 92 N. E. 814.

In the case of *In re New York,* 174 N. Y. 26, 66 N. E. 584, it appeared that city authorities, in preparing to build a bridge with suitable approaches, sought to condemn land upon which to place approaches. It further appeared that the so-called approaches consisted of streets extending a considerable distance from the end of the bridge incline. The court, in passing upon that question, stated:

"While it is true that the statute as well as the petition and other papers in the proceedings refer to the 'bridge and approaches,' it is clearly shown by the plans and maps on file that the term 'approaches' is applied not only to the physical structures immediately connected with the roadway of the bridge, but to those contiguous and converging streets and avenues through and over which the public are to gain access to the bridge. This use of the term 'approaches,' as applied to the physical conditions of the *locus in quo,* is no less accurate than the narrower definition contended for by the appellants would be, as applied

to a mere taking of lands for bridge approaches without any widening or changing of adjacent streets."

In defining the power and right of a city council to determine the extent and nature of a bridge approach, the supreme court of Iowa stated as follows in *Shope v. Des Moines, supra:*

"The statute conferred the power to construct the bridge, and incident to that power was that of determining, in so far as there might be controversy, the extent and nature of the approach required. In other words, it was for the engineers, in preparing the plans and specifications, and ultimately for the city council, to determine what would be included in the bridge, and this must have been done in the orderly course of business, before directing its construction and providing for the payment of its cost by the issuance and sale of bonds and letting the contract on advertisement of bids."

The case presenting a situation analogous to that in the case at bar is *State ex rel. Schaefer v. Zangerle,* 43 Ohio App. 30, 182 N. E. 644, where the following facts were present: Bonds were voted by the people for the purpose of paying the cost and expenses of erecting a bridge with the necessary approaches, the total amount of the bond issue being $7,000,000. The bridge structure was erected for approximately $800,000 less than was contemplated. The commissioners then decided to expend approximately $250,000 of the amount unexpended in the widening and improving of certain avenues and streets near the bridge for the purpose of diverting travel to the bridge.

The plaintiff in that case contended that the moneys were voted by the people to build the bridge and its approaches, and that the streets to be improved could not be considered as approaches. In passing upon the question, the court stated:

"The gist of the plaintiff's contention is to the effect that no part of the proceeds of the $7,000,000 bond

issue can be used for any such purpose, as the contemplated improvements as now planned are not in fact approaches. The language used for the submission of the $7,000,000 bond issue is broader than the interpretation sought to be given it by the complaining taxpayer. It states '. . . for the purpose of paying the cost and expenses of erecting a bridge with the necessary approaches thereto . . .'

"It must follow that, if the proposed expenditure complained of comes within the meaning of the phrase 'necessary approaches thereto,' the defendants would be authorized to proceed with such expenditures out of the proceeds of the $7,000,000 bond issue.

"We are indebted to counsel for furnishing this court considerable aid as to the definition of the term 'necessary approaches.' Webster's New International Dictionary defines an approach as 'a way, passage, or avenue by which a place or building can be approached; an access.'

"Mr. Wilbur Watson, member of the firm who are the consulting engineers on both the Lorain-Carnegie and Main Avenue bridges, offered a definition from an engineering standpoint as follows: 'The approaches to a bridge comprise the necessary traffic arteries and adjustment thereof, to develop its maximum traffic capacity.' "

It then cited *In re New York*, 174 N. Y. 26, 66 N. E. 584, and *Chicago v. Pittsburgh, Ft. W. & C. R. Co.*, 247 Ill. 319, 93 N. E. 307, 139 Am. St. 329, in support of its holding, and continued as follows:

"We are content to adopt the definition of approaches offered by counsel as follows: 'The approaches to a bridge comprise the traffic arteries leading to the ends of the bridge proper and such adjustment of the alignments and grades of said arteries in the immediate vicinity of such ends as is necessary to afford the maximum convenience of access and render available to the public the entire capacity of the bridge proper.'

"The language used in the submission of the $7,000,000 bond issue to the people of Cleveland, which contained the phrase 'of erecting a bridge with the

necessary approaches thereto,' was not accidental. There was a definite purpose in the use of said language. A bridge without adequate approaches, such as to assure the fullest and most convenient use of such bridge, would be of little avail and would almost defeat the purpose of its erection. Those who are by law directed and empowered to carry out the will of the people, as set forth in the language used in the submission of bond issues, are under a mandatory duty not only to build the bridge, but also to build the necessary approaches thereto in order to afford the fullest use of the monumental structure now known as the Lorain-Carnegie bridge. A failure so to do on the part of the officers, whose duty it is to carry out the will of the people, would defeat in the main the principal purpose of the erection of the Lorain-Carnegie bridge, as it must be apparent that the bridge without the necessary approaches would be a useless structure. . . .

"The question as to what are necessary approaches is a question of fact. The evidence presented to this court consists of the testimony of Mr. Wilbur Watson, famous engineer, plus certain maps and blueprints. No other evidence was offered on the subject of what are necessary approaches. Therefore the evidence is conclusive that the improvements which the commissioners regard as necessary approaches, and of which the plaintiff is complaining, are in fact necessary approaches.

"We conclude, therefore, that the defendants are not only empowered to proceed with the improvements sought to be enjoined, but also that they are under a mandatory duty to proceed with the same, as a failure to construct the necessary approaches would result in a woeful waste of public funds which were expended in the erection of the bridge proper. The court is of the opinion that this duty should be exercised with all reasonable promptness, to the best interests of a unified Cleveland."

It was a manifest intention of the legislature to give to the authority all those powers necessary to cope with the intricate questions incident to our modern and complex problems of transportation, and to vest in the

authority a wide discretion in the exercise of those powers.

The court will not concern itself with the exercise of the discretion delegated to an administrative agency unless it appears that the agency has acted in bad faith or abused its discretion.

In *In re Yesler Way*, 94 Wash. 427, 162 Pac. 536, this court stated:

"If the proper legislative body of the city had power to order such improvement as is here contemplated, under the statutes relied upon, the questions of the location, route and termini are legislative questions purely with which courts have no concern.

"The legislative body, by proper proceedings, declared the public necessity for the improvement. That, in a proper case, when the power so to do is clearly conferred, its action in so doing is final and not a reviewable question has been so often and consistently held by this court that it needs no citation."

In defining arbitrary or capricious action, Judge Fullerton, speaking for the court in *Sweitzer v. Industrial Ins. Commission*, 116 Wash. 398, 199 Pac. 724, in deciding whether the industrial commission acted arbitrarily or capriciously, said:

"There is no evidence in the record justifying its conclusion that the commissioners in refusing to reopen the respondent's case acted either arbitrarily or capriciously. On the contrary, the evidence shows that they exercised the utmost good faith in their consideration of the case. They not only heard the respondent himself with respect to his ailments, but they caused him to be examined by their own medical examiners as well as by physicians not connected with the department, who are acknowledged experts on diseases and injuries of the character of which he complained, and based their action upon the results of these inquiries. The most that can be said of their action, even from the respondent's point of view, is that they erred in

judgment. But this is not arbitrary or capricious action. These terms, when used in this connection, must mean wilful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case."

A hard and fast rule cannot be applied in ascertaining what is or is not an abuse of discretion. Each case must be determined upon its own merits, taking into consideration all of the facts and circumstances present. *State ex rel. Cowles v. Schively,* 63 Wash. 103, 114 Pac. 901; *State ex rel. Farmer v. Austin,* 186 Wash. 577, 59 P. (2d) 379; *State ex rel. Linden v. Bunge,* 192 Wash. 245, 73 P. (2d) 516.

Respondent has called our attention to the case of *Rumsey v. Department of Labor & Industries, supra,* in which we determined that a certain structure was not an approach to a bridge.

That case was decided upon the peculiar facts presented by the evidence, and had to do only with the classification of workmen engaged upon highway work. In that case, we stated:

"Appellant also argues that the construction constitutes an approach to the Nisqually bridge, and is therefore part of that structure. As to this latter contention, the question of when a roadway or viaduct constitutes an approach to a bridge is one of fact as well as of law, and the determination of this question must in each instance be based upon the peculiar facts as disclosed by the record. *Chicago v. Pittsburgh etc. Co.,* 247 Ill. 319, 93 N. E. 307, 139 Am. St. 329; *Norwalk v. Podmore,* 86 Conn. 658, 86 Atl. 582; *Coffin v. Laskau,* 89 Conn. 325, 94 Atl. 370, L. R. A. 1915E, 959."

We conclude that the determination of what constituted approaches was a question to be determined by the authority, acting within the discretion given it by the legislature; and, considering the extent of the

project and the definite results sought to be accomplished, the authority did not abuse its discretion.

The writ will issue.

MAIN, MILLARD, and GERAGHTY, JJ., concur.

ROBINSON, J. (concurring)—I concur in the foregoing opinion upon the understanding expressed in one of the attached dissents that it is corollary to the holding that the approaches are parts of the bridge that the toll bridge authority shall be liable for their maintenance.

BEALS, J. (specially concurring)—By Rem. Rev. Stat., Vol. 7A, § 6524-3, quoted in the majority opinion, the Washington toll bridge authority is vested with wide powers and, it seems to me, necessarily, with a broad discretion. It is empowered to establish and construct toll bridges upon any public highways of this state. Of course, no highway of which a bridge is a necessary part can exist without the bridge; and if no means are provided for connecting a new bridge with existing highways, the authority granted would be limited to replacements or to the construction of bridges in connection with new highways. If a new bridge is to be used in connection with existing highways, it must be connected with those highways in such a manner as to give safe and easy access to the bridge. This may involve considerable improvement of existing roads or the construction of new means of access; and, in my opinion, the authority is necessarily vested with a broad discretion, to be exercised in connection with its power to select certain sites for the construction of toll bridges.

A toll bridge implies a money-making project. If such a bridge is to be not only useful to the public, but sufficiently useful to produce a reasonable financial return, the members of the group which may select the site and determine whether or not the bridge should

be constructed should have authority to accomplish all things reasonably necessary to make the project produce an adequate return by way of tolls. Unless the act constituting the authority be so construed, it is probable that, except in rare instances, toll bridges could be constructed thereunder only by way of replacing existing bridges, or in connection with new highways.

In my opinion, the word "approaches," as used in the act, should not be limited to the meaning ordinarily given to approaches to a bridge, but should include such means of access to the bridge as will, in connection with existing highways, reasonably tend to cause the traveling public to use the bridge in numbers sufficient to produce an adequate return by way of tolls.

Clearly, the bridge construction which is the subject matter of this proceeding can be made useful and safe to the traveling public only by the construction of adequate means of access to the bridge, the existing streets being extremely inconvenient and, indeed, absolutely inadequate for that purpose. While the tunnels and other methods of approach to the proposed toll bridge involve a great deal of expensive construction, in view of the wide powers vested in the authority by the statute, in my opinion, the court should not say that the authority has exceeded its powers in adopting the plans which are a part of the record herein. A governmental agency, vested by the legislature with authority to construct toll bridges, should be vested with authority sufficiently broad to not only build toll bridges, but to build them in such a manner that they will produce an adequate return. For this reason, it seems to me that cases in which questions involving approaches to bridges, in which the word approach is used in the ordinary sense, are not here in point. The exercise of the discretion vested in the authority is,

of course, subject to review; but, in my opinion, the record here shows no abuse of that discretion.

In the main, I am in accord with the opinion of the majority, but I desire to express my thought that a toll bridge differs so basically from bridges which may be used by the public without charge that a different rule should be applied in determining the questions here presented than applies in questions involving bridges other than the toll variety. I therefore concur in the result reached by the majority.

HOLCOMB, J. (dissenting)—It is necessary to ascertain whether the term "approaches," as used in Laws of 1937, chapter 173, p. 654, Rem. Rev. Stat., Vol. 7A, §§ 6524-1 to 6524-21, comprehends the so-called approaches contemplated by the authority.

The so-called approach contemplates a one-fourth mile long twin-bore tunnel and the construction of an arterial highway for a distance something in excess of six thousand lineal feet on the west side of Lake Washington leading up to the bridge, most of it being very remote from the bridge. The so-called approaches on the eastern side of the lake cover a distance in excess of sixteen thousand lineal feet, about three miles.

The parties stipulated that the distance covered by the so-called approaches on the western side of Lake Washington are as follows:

"The western approach of the Lake Washington Toll Bridge commences at the northeast corner of Beacon Hill in the City of Seattle, in the vicinity of the Marine Hospital and at an intersection of 17th Avenue South and Corwin Place, with ready access to 12th Avenue South and with connections to Rainier Avenue in the vicinity south of Dearborn Street; the project then continues easterly for a distance of 633.72 feet to an overcrossing approach structure; this overcrossing approach structure has a length of 778.0 feet and carries this project over Poplar Place, Rainier Avenue and

20th Avenue South; from this Rainier Avenue Over-crossing structure the project then continues easterly for a distance of 840.2 feet to a point at the center of an undercrossing at which point 23d Avenue South is carried by a concrete structure over this project; the project then continues easterly for a distance of 294.8 feet to the center of an undercrossing which carries pedestrian traffic on a concrete structure over this project at 24th Avenue South; the project then continues easterly for a distance of 797.45 feet to an over-crossing structure crossing over 27th Avenue South, which 27th Avenue South Overcrossing has a length of 140.0 feet; the project then continues easterly for a distance of 733.55 feet to the west portal of a tunnel at a point just west of Yakima Avenue; the project then continues easterly through a twin bore tunnel having a length of 1445.0 feet to its east portal; from the east portal of the twin bore tunnel the project then continues easterly for a distance of 364.0 feet, making connections with 35th Avenue South to the westerly end of the west incline transition span; the project then continues by means of the west incline transition span crossing over 36th Avenue South and Lakeside Avenue and having a length of 1062.0 feet to a transition connection with the pontoon structure; . . ."

They further stipulated as follows in regard to the so-called approach on the eastern side of Lake Washington:

". . . the project then continues easterly on Mercer Island, including the toll plaza structure and administration building, for a distance of 391.75 feet to the beginning of an overcrossing structure; there then continues an overcrossing structure carrying this project over Mercer Street and having a length of 63.0 feet; the project then continues easterly for a distance of 918.25 feet to the center of an undercrossing whereby Mercer Boulevard is carried by a concrete structure over this project; the project then continues easterly for a distance of 865.0 feet to the center of an undercrossing by which Summit Avenue is carried over this project; the project then continues easterly for a distance of 2173.5 feet to an overcrossing structure which over-

crossing structure has a length of 280.0 feet and carries this project over Thompson Avenue; the project then continues easterly for a distance of 2021.0 feet to an overcrossing structure; this overcrossing structure passes over local traffic and has a length of 121.0 feet; the project then continues easterly for a distance of 5176.5 feet to another overcrossing structure; here there is an overcrossing structure carrying the project over local traffic, such overcrossing structure having a length of 123.0 feet; the project then continues easterly for a distance of 2383.0 feet to the beginning of the east channel bridge; there is here a bridge of steel construction across the east channel of Lake Washington having a length of 1357.0 feet; the project then continues easterly for a distance of 164.0 feet to a short overcrossing structure passing over a local traffic road and having a length of 122.0 feet; the project then continues easterly for a distance of 1801.0 feet to the beginning of the Mercer Slough structure; here there is a steel and concrete structure 2578.0 feet in length carrying this project over Mercer Slough and over Secondary State Highway No. 2-A to the end of the project, making connections with such secondary state highway."

The majority rely upon *In re New York,* 174 N. Y. 26, 66 N. E. 584, and *State ex rel. Schaefer v. Zangerle,* 43 Ohio App. 30, 182 N. E. 644. While the precise scope and extent of the street improvements leading up to the bridge are not disclosed in terms of lineal feet in those cases, it is extremely doubtful if the improvements contemplated therein even tended to approximate the distance of those involved here. In addition, the improvements had reference only to contiguous streets converging on the bridge.

The opinion of the engineers is only opinion evidence and, like other opinion evidence, is not entitled to great weight when opposed to known physical facts open to every one, or where absurd. The decision of the inferior appellate court of Ohio, relied upon by the

majority, is distinguishable on its facts. Moreover, the physical conditions there rendered the approaches really approaches. There is no comparison between that case and this.

In *Chicago v. Pittsburgh, Ft. W. & C. R. Co.*, 247 Ill. 319, 93 N. E. 307, 139 Am. St. 329, relied upon by the majority, it should be observed that the court recognized very definite limitations inhered in the term "approaches." The court said:

"If the rise to a viaduct from the ordinary surface of the ground is not more than six or eight feet, it is not generally thought necessary to commence the ascent or approach more than a block away from the viaduct proper. If, however, the public authorities and the property owners along a street for three or four blocks all agree to distribute this grade of six or eight feet over said three or four blocks and have the pavement, curbs, sidewalks, and buildings for that distance conform thereto, it could hardly be argued that the whole of such three or four blocks was a part of the approach, which the railway company constructing the viaduct would be compelled to maintain and keep in repair. As was said by this court in *City of Bloomington v. Illinois Central Railroad Co., supra*, [154 Ill.] on page 547 [39 N. E. 481]: 'What is to be considered as the extent of the approaches to the railroad crossing must be determined by what is reasonable in the particular case.' "

The decision of the majority marks a clear departure from *Rumsey v. Department of Labor & Industries*, 192 Wash. 538, 74 P. (2d) 214, in which this court held that construction work on a road leading up to a bridge no nearer than one hundred fifty feet on either side thereof did not constitute an approach to the bridge. It should be noted that the bridge under consideration in that case is one over which a very substantial stream of vehicular traffic moves. The court stated:

*"The construction work accomplished by respondent approached the Nisqually river no nearer than one*

*hundred fifty feet on either side thereof.* The elevation of respondent's work above the level of the ground was practically constant; some of the adjoining roadway was filled in; and, considering the terrain, the length of the road constructed by respondent, and all the surrounding circumstances as disclosed by the record, *we are clearly of the opinion that the construction work performed by respondent cannot be held to constitute an approach to the bridge over the Nisqually river.* Between two sections of the work performed by respondent is some seven hundred feet of filled roadway not covered by respondent's contract. It was neither more nor less than an elevated roadway, and was no more an approach to the bridge than other portions of the road up to a mile or so distant. We hold that none of the construction work performed by respondent constituted an approach to the Nisqually bridge." (Italics mine.)

The majority also relies upon the case of *Shope v. Des Moines,* 188 Iowa 1141, 177 N. W. 79, in support of the view that an approach is that which is necessary to reach the main structure and the absence of which would render the bridge incomplete and useless. We cannot agree that this definition warrants the construction of an approach of the magnitude of the one contemplated here.

In *Person v. Polk County,* 193 Iowa 733, 185 N. W. 491, an approach is defined as "that part of the roadway which is essential to make the bridge accessible and convenient for public use."

It would be futile to collate or multiply further the definitions of the term "approaches." That the determination of what constitutes an approach to a bridge is a mixed question of law and fact, does not admit of argument. However, approaches to a bridge may only extend a reasonable distance. *Lehigh Valley R. Co. v. Canal Board,* 204 N. Y. 471, 97 N. E. 964, Ann. Cas. 1913C, 1228.

It will also be admitted that the motoring public must have, and is entitled to, convenient access to the bridge; but in thus arranging for the public accommodation, the term "approaches" must be given a reasonable construction, and the authority may not transcend the limits of that term envisaged by the legislature and embark upon the construction of highways under the guise of building approaches to a toll bridge.

Considering the distance the so-called approaches are situated from the bridge on each side of the lake, and conceding that the public must be afforded reasonable access to the bridge, I am convinced that the majority have given the term "approaches" an unreasonable and unwarranted extension, and have permitted the toll bridge authority to improve streets and to construct highways within such a wide radius and so far removed from the bridge that it may improve almost any street which, in its discretion, it deems will encourage the use of the bridge, and the bridge project must bear the expense of such improvements through the medium of tolls.

Whatever else may be said of the $8,432,000 total cost, $4,682,000, or more than one-half, is the cost of constructing arterial highways. This total cost constitutes merely an "approach" to Federal funds.

Rem. Rev. Stat., Vol. 7A, § 6524-3, empowers the toll bridge authority to construct

". . . toll bridges upon any public highways of this state together with approaches thereto wherever the same is considered necessary or advantageous and practicable for crossing any stream, body of water, gulch, navigable water, swamp or other topographical formation. . . ."

but it has been vested with no authority whatever to construct highways as such.

It would have just as much power and authority to provide a tunnel through the Cascade range, or a viaduct from Tacoma to connect with the proposed tunnel through the hill on the west side of the pontoon bridge in Seattle. They would be no more absurdities than these so-called "approaches."

When the power to act has been clearly conferred, as stated in *In re Yesler Way,* 94 Wash. 427, 162 Pac. 536, which is relied upon by the majority, no one will dispute that such action of a proper legislative body or authority is final and not a reviewable question for the courts. That, however, is a widely different question from establishing highways under the guise of building toll bridges.

No one will dispute, either, that, the state highway department has the right to establish such highways, and the courts have always supported that right; but this toll bridge authority has no right whatever to establish highways under the guise of building toll bridges.

It is manifest the authority has abused its discretion, and has acted in utter disregard of the facts and circumstances in providing for such an approach. *Sweitzer v. Industrial Ins. Commission,* 116 Wash. 398, 199 Pac. 724.

I therefore dissent.

BLAKE, J., concurs with HOLCOMB, J.

STEINERT, C. J. (dissenting)—I concur in the view expressed by Judge Holcomb and will add, further, that the effect of the majority opinion, as I interpret it, will be to require the toll bridge authority to bear the expense of future maintenance, not only of the bridge proper, but also of the "approaches," including an extensive arterial highway within the limits of the city of Seattle and three miles of highway outside the

city. I do not believe that the statute contemplated the application of the funds of the toll bridge authority to maintenance of arterial highways inside the city or main highways outside it. The logical effect of the majority opinion emphasizes what I believe to be an erroneous construction of the term "approaches."

I am likewise unable to assent to the view expressed in the concurring opinion by Judge Beals. Proceeding from the premise that a toll bridge is "a money-making project," the concurring opinion concludes that the members of the group which selects the site of the bridge "should have authority to accomplish all things reasonably necessary to make the project produce an adequate return by way of tolls." For this reason, it is suggested that, in determining what constitutes an approach, the rule to be applied to a toll bridge should be different from that applied to the ordinary bridge. This seems to me to be a perversion of the spirit and intent of the act creating the Washington toll bridge authority. Laws of 1937, chapter 173, p. 654 (Rem. Rev. Stat., Vol. 7A, §§ 6524-1 to 6524-21). Instead of empowering the authority to provide for the establishing and constructing of toll bridges "upon any public highways of this state together with approaches thereto," as prescribed by the legislature, the act is, by the concurring opinion, made to empower that body to enter upon a vast scheme of street and road building in order to make a contemplated bridge "a money-making project." If, with that end in view, an arterial highway may be built across the width of the city in one direction, then, in order to invite more traffic and thus to secure the needed revenue, a network of diverging highways may be built in all directions. It will be another case of the end justifying the means.

It may well be that such a system of arterial highways may be highly desirable and even necessary to

accommodate the traffic that will use the bridge, but in my opinion that is a matter for the state highway department or for the city of Seattle, wherever they may obtain the funds, but it is not a matter for the toll bridge authority under the powers vested in it by the act.