[No. 28207. *En Banc.* October 1, 1940.]

THE STATE OF WASHINGTON, *on the Relation of the Washington Toll Bridge Authority, Plaintiff,* v. CLIFF YELLE, *as State Auditor, Respondent.*[1]

[1]Reported in 105 P. (2d) 813.

*The Attorney General* and *P. H. Winston, Assistant,* for relator.

*Thos. L. O'Leary,* for respondent.

JEFFERS, J.—This is an original mandamus action instituted by the Washington Toll Bridge Authority (hereinafter referred to as the authority), for a writ of mandate requiring the state auditor to sign and execute Tacoma Narrows bridge revenue bonds (hereinafter referred to as Narrows bridge bonds) and Lake Washington Bridge revenue bonds, and to permit and authorize the use of a facsimile of his signature upon all the coupons attached to such bonds. The application for the writ is supported by the affidavit of P. H. Winston, assistant attorney general and acting secretary of the authority. The material facts shown by this affidavit, and which are admitted by respondent, may be stated as follows:

The authority was created by Laws of 1937, chapter 173, p. 654 (Rem. Rev. Stat., Vol. 7A., §§ 6524-1 to 6524-21 [P. C. §§ 2697-501 to 2697-521]), and is a state agency composed of the governor, state auditor, director of finance, budget and business, director of highways, and director of public service. At the time of this action, the authority was composed of Clarence D. Martin, governor, chairman of the authority; Cliff

Yelle, state auditor; Don G. Abel, director of public service; Lacey V. Murrow, director of highways; and Olaf L. Olsen, director of finance, budget and business.

By § 6524-3 [P. C. § 2697-503], *supra,* the authority is empowered to provide for the establishing and constructing of toll bridges upon any public highway of this state, whenever the same is considered necessary or advantageous and practicable for crossing any stream, body of water, gulch, navigable water, swamp, or other topographical formation, whether the same is within this state or constitutes a boundary between this state and an adjoining state or county. The necessity or advantage and practicability of such toll bridge shall be determined by the authority, and the feasibility of financing any toll bridge in the manner provided by the act shall be a primary consideration and determined according to the best judgment of the authority.

Section 6524-7 [P. C. § 2697-508], *supra,* provides for the issuance of revenue bonds, especially providing that such bonds shall constitute an obligation only of the authority, and shall not constitute a debt, liability or obligation of the state of Washington. Section 6524-8 [P. C. § 2697-509] provides that all bonds authorized under the terms of the act may be issued and sold by the authority from time to time, and in such amounts as may be deemed necessary, in the judgment of the authority, to provide funds for the construction of any toll bridge or bridges. This section gives to the authority the power to determine the form, conditions, denomination and maturity dates of such bonds, and further provides that all bonds issued under the terms of the act shall be negotiable instruments, and that all bonds issued and sold under or by authority of the act shall be sold on sealed proposals to the highest and best bidder, after such advertising for bids as the authority may deem proper.

It is provided in § 6524-17 [P. C. § 2697-518], *supra,* that the authority, the officials thereof, and all state officials, are empowered to do such acts and make such agreements not inconsistent with law as may be *necessary* or *desirable* in connection with the duties and powers conferred upon them respectively by law, regarding the construction, maintenance, operation, and insurance of such toll bridges, or the safeguarding of the funds and revenues required for such construction and the *payment of the indebtedness* incurred therefor.

The act further provides that all bonds shall be signed by the state auditor and countersigned by the governor, and that all interest coupons shall bear the facsimile signature of the state auditor.

Pursuant to this act, the authority constructed the Narrows bridge (connecting a public street in the city of Tacoma and primary state highway No. 14) across the Narrows, a navigable body of water of Puget sound. The estimated cost of this structure was $6,400,000, which cost was met by procuring from the public works administration an out-and-out grant of $2,-880,000, and a loan from the reconstruction finance corporation of $3,520,000, for which Narrows bridge bonds in the sum of $3,520,000 were issued to the RFC. These bonds bore interest at the rate of four per cent per annum, and all were to mature in thirty years. They were redeemable before maturity upon payment of a specified redemption premium.

The authority constructed the Lake Washington bridge (connecting a city street of the city of Seattle with secondary state highway No. 2A, in King county), and to meet the cost of construction, the authority secured from the PWA an out-and-out grant of forty-five per cent of the estimated cost of this bridge, or $3,794,400, and issued and sold to A. C. Allyn & Com-

pany bonds in the amount of $5,500,000, to meet the additional fifty-five per cent of the estimated cost. The Lake Washington bridge bonds all were to mature in thirty years, and provided for interest at four per cent per annum. These bonds also provided for a redemption premium.

The Narrows bridge was substantially completed and opened for traffic on July 1, 1940, and the Lake Washington bridge on July 2, 1940. A reserve fund was provided for in each case.

At the time these bridges were opened to the public, there remained to be done some work on each bridge, which is necessary and could not have been anticipated, and it will be necessary to have a small amount of funds beyond that at the present time available.

In about two months operation, the tolls collected from these bridges exceeded the original estimates, and the authority began to consider the possibility of a refinancing program, by which some additional funds could be secured and at the same time both bridges could be refinanced on a more favorable basis. After some inquiry and investigation, an offer was obtained from A. C. Allyn & Company to furnish funds for the refinancing of both these bridges, and to accept toll bridge revenue bonds as security therefor. On August 26, 1940, the authority adopted a resolution accepting the offer of A. C. Allyn & Company. Under the new program, the Narrows bridge refunding bonds will mature in fifteen years, and the Lake Washington bridge bonds in twenty years. It is stated in the affidavit, and not disputed, that, under this new arrangement, the reduction in annual interest and in redemption premiums, and the reduction of the inactive reserve fund, together with a shortening of the maturity dates of the bonds, will result in a great saving to the authority and to the state of Washington. The

saving under the agreement with A. C. Allyn & Company is estimated by the state auditor at $1,626,144. A considerable portion of this saving is due to the fact that A. C. Allyn & Company and associates have secured all the Narrows bridge bonds, in the amount of $3,520,000, and have made them available to the authority, under the agreement for refinancing, at a price of 100¾ instead of 105, as provided in the agreement between the authority and the RFC.

While no call for bids on the refinancing scheme was made by the authority, and no advertisement was ordered by the authority, information relative to the refinancing scheme and the purpose of the authority became known to the public and was advertised through the medium of various newspaper articles, copies of such articles being attached to the affidavit.

The state auditor, in a letter to the authority, while expressing sympathy with the plan of refinancing, and recognizing the saving to be accomplished thereby, stated that he questioned the power of the authority to issue bonds for the purpose of refinancing toll bridges; that he also questioned the power of the authority to legally enter into such a refinancing plan upon an offer produced by negotiation rather than in response to a public call for bids; and that, therefore, he would refuse to sign any bonds issued and sold under the proposed refinancing plan until the legality thereof was determined or he was ordered so to do by a court of competent jurisdiction.

On August 26, 1940, an order was issued directing the state auditor to appear on September 9th and show cause why the writ should not issue. A return was filed by the state auditor, in which he demurred to the application upon the ground that it did not state facts sufficient to constitute a cause of action or to justify the issuance of the return applied for.

Two questions are presented for determination. The first question is whether or not the authority, having issued and sold revenue bonds for the construction of these two toll bridges, has the power, either express or implied, under the act, to subsequently issue bonds for the purpose of refinancing the cost of such toll bridges. The second question is: If the authority has the power to issue bonds for the above purpose, has the authority the power to sell the refunding or refinancing bonds by private negotiations, rather than pursuant to advertising for bids, as provided by the act?

As we have stated, the authority was created by chapter 173, Laws of 1937, and in *State ex rel. Washington Toll Bridge Authority v. Yelle*, 195 Wash. 636, 82 P. (2d) 120, the act was held to be constitutional.

While there is no express power conferred by chapter 173, *supra,* to issue refunding bonds or bonds to refinance the cost of construction of toll bridges, it is apparent to us, from a reading of this entire act, and especially § 6524-17, *supra,* hereinbefore referred to, that the legislature intended to vest in the authority a wide discretion in matters pertaining to the construction, operation, maintenance, and financing of toll bridges. We desire to again call attention to that portion of § 6524-17, *supra,* which provides:

"The Washington Toll Bridge Authority, the officials thereof and all state officials are empowered to do such acts and make such agreements not inconsistent with law as may be necessary or desirable in connection with the duties and powers conferred upon them respectively by law regarding the construction, maintenance, operation and insurance of such toll bridges or the safeguarding of the funds and revenues required for such construction *and the payment of the indebtedness incurred therefor.*" (Italics ours.)

We think unquestionably it has been the policy of the state to operate and maintain its highways and bridges toll free, and having this in mind, we are of the opinion it is reasonable to assume the legislature had in mind that the toll bridges to be constructed under the act would be made toll free as soon as possible.

Considering, then, the intent of the legislature above referred to, the wide discretion given the authority in the matter of the construction of toll bridges and financing such construction, and especially having in mind § 6524-17, *supra,* we are of the opinion the authority has the implied power, from the powers expressly conferred, when considered in connection with the intent of the legislature, to refinance outstanding bonds issued to pay for the construction of toll bridges, when and in the event the authority shall determine such action to be desirable and advantageous, and when such refinancing will effect a saving to the authority and the state, and make the bridge or bridges available to the public toll free at an earlier date than under the original financial set-up.

This act was considered in *State ex rel. Washington Toll Bridge Authority v. Yelle,* 197 Wash. 110, 84 P. (2d) 688. While the cited case deals with the question of approaches to the Lake Washington bridge, it recognizes that the authority is vested by the act with a broad discretion and power. The opinion states in part:

"That act, Laws of 1937, chapter 173, p. 654 (Rem. Rev. Stat., Vol. 7-A, §§ 6524-1 to 6524-21), vests the authority with the definite powers and broad discretion in the construction of toll bridges and their approaches, and is comprehensive in scope. . . .

"It was a manifest intention of the legislature to give to the authority all those powers necessary to cope with the intricate questions incident to our modern and complex problems of transportation, and to vest in the

authority a wide discretion in the exercise of those powers."

A case much in point on the question discussed is *State Highway Commission v. King,* 259 Ky. 414, 82 S. W. (2d) 443, which involved the construction of a law known as the Murphy toll bridge act. This act authorized the highway commission of Kentucky to issue bonds for the purpose of obtaining funds with which to build or acquire bridges, in such amounts and bearing such rate of interest, not exceeding six per cent per annum, as might be deemed best by the commission. In many respects, the Kentucky act is similar to our own toll bridge act. In the cited case, bonds were issued and sold by the commission. Subsequently, it was determined to refund this indebtedness at a lower rate of interest, and the bid of McNear & Co. was accepted for such bonds. The question of the right of the commission to sell bridge revenue bonds for the purpose of retiring all outstanding bridge revenue bonds was discussed and such power in the commission upheld, the court stating:

"The right of the highway commission to issue bridge revenue refunding bonds is not seriously challenged. Although there is no specific statutory authority for such procedure, the commission clearly has the implied power to issue and sell refunding bonds. The act creating the highway commission vests it with broad powers, and the toll bridge acts of 1928 and 1930 imposed upon the commission the duty to operate and control the bridges built or purchased under the provisions of the acts in such a manner as to pay off the indebtedness at the earliest possible date, and thus to free them to the use of the traveling public. This clearly expressed purpose runs through these acts, and it was evidently the intention of the Legislature to make it the duty of the commission in the exercise of its sound discretion to operate and maintain the bridges, fix the toll rates, and finance the costs so as to accomplish the primary

object of the Legislature, to wit, the acquirement of bridges free of tolls as a part of the state primary system of highways at the earliest possible date. The implied power to refund outstanding bonds at a lower interest rate and thus, in effect, to reduce the indebtedness is a necessary incident of the powers expressly conferred in view of the purpose of the toll bridge acts.

. . .

"The appellant argues that aside from its implied power it has definite authority to refund the outstanding indebtedness when it can do so to the advantage of the traveling public who use the toll bridges constructed by it, since specific authority has been vested in the commission to issue and sell bridge revenue bonds, and many authorities are cited in support of its contention. We deem it unnecessary to express our views on this question, since we have concluded that the highway commission at least has the implied power, in the circumstances, to issue refunding bonds, and the circuit court correctly so held. The decision of the state highway commission to refund the outstanding indebtedness at a lower interest rate was a wise exercise of its discretion in the matter in view of the present favorable condition of the bond market, and was in thorough accord with the spirit and purpose of the toll bridge acts."

It will be noted that the Kentucky toll bridge act, like our act, did not expressly authorize the highway commission to issue refunding bonds.

While our toll bridge act does not expressly state that the legislative intent is to cause toll bridges to become free for public use at the earliest possible date, yet, as we have stated, we are clearly of the opinion that was the legislative intent.

Another Kentucky case much in point is *Cook v. Louisville,* 260 Ky. 474, 86 S. W. (2d) 157, wherein the court stated:

"Any doubt that may have existed concerning the power of the Bridge Commission to refund the original issue of bonds has been set at rest by the decision of

this court in *State Highway Commission v. King*, 259 Ky. 414, 82 S. W. (2d) 443, 446, as are also most of the other objections raised by appellant to the proposed refunding. We held in that case that powers given to the State Highway Commission in the operation, maintenance, and financing of state toll bridges, under acts substantially similar to the Bridge Commission Act, clearly implied a power to refund the bonds provided for in those acts, although no such power was expressly conferred. We said in that case:

" 'The implied power to refund outstanding bonds at a lower interest rate and thus, in effect, to reduce the indebtedness is a necessary incident of the powers expressly conferred in view of the purpose of the toll bridge act.' "

We do not find much, if anything, in the other cases cited by relator which is helpful in the present situation.

Respondent concedes that the two Kentucky cases above cited are strong authority for the position taken by relator, but contends that the powers granted public agencies are to be strictly construed, and that express power granted to such agencies to issue bonds does not carry with it the implied power to issue new bonds to replace those already outstanding, citing *Merrill v. Monticello*, 138 U. S. 673, 34 L. Ed. 1069, 11 S. Ct. 441, and *Coquard v. Oquawka*, 192 Ill. 355, 61 N. E. 660.

The *Merrill* case, *supra*, involved the question of the power of the town of Monticello, Indiana, to issue negotiable refunding bonds. We quote from the opinion:

"It is admitted that the power to borrow money, or to incur indebtedness, carries with it the power to issue the usual evidences of indebtedness, by the corporation, to the lender or other creditor. Such evidences may be in the form of promissory notes, warrants and, perhaps, most generally, in that of a bond. But there is a marked legal difference between the power to give a note to a lender for the amount of money borrowed, or to a creditor for the amount due, and the power to

issue for sale, in open market, a bond, as a commercial security, with immunity, in the hands of a *bona fide* holder for value, from equitable defences."

The cited case is, in our opinion, distinguishable on the facts. In the instant case, the statute expressly provides that all bonds issued or sold under the act shall be negotiable instruments under the law merchant.

The *Coquard* case, *supra,* holds that a city has no implied power to issue negotiable refunding bonds from its ordinary powers as a municipal corporation or from its power conferred by statute to issue the original bonds. We think the basis of the decision in the cited case, and the distinguishing feature, is shown by the following quotation from the opinion:

"If it can [referring to the municipality], then, against the policy of our laws and without legislative authority, a municipal debt may forever be kept alive, and the municipality be subjected to the many disabilities and hardships which the law imposes on the makers of negotiable instruments when such instruments are held by innocent holders for value before maturity."

We are therefore of the opinion that the authority had the implied power to issue bonds for the purpose of refinancing the construction of the Narrows and Lake Washington toll bridges.

We now come to the question of whether or not the authority had the power to sell such refunding or refinancing bonds by private negotiations rather than after advertising for competitive bids.

Rem. Rev. Stat., Vol 7A, § 6524-8, provides in part as follows:

"All bonds issued and sold under or by authority of this act shall be sold on sealed proposals to the highest and best bidder after such advertising for bids as the Washington Toll Bridge Authority may deem proper: *Provided, however,* Said authority may reject any and

all bids so submitted and may thereafter sell such bonds so advertised for sale at private sale under such terms and conditions as said authority may deem most advantageous to its own interests: *Provided,* They are not sold at a price below that of the best bid which was rejected."

The above section undoubtedly gives to the authority a wide discretion in the method of advertising and the length of time of any such advertisement. Still, in our opinion, the statute contemplates that, in the first instance, the authority shall advertise for bids, in such manner as to it shall seem proper under the circumstances, to the end that there may be an opportunity afforded for competitive bidding, and that such bonds shall be sold to the highest and best bidder, and it is only after such advertising and after a rejection of all bids submitted pursuant thereto that the authority may sell such bonds at private sale, under such terms and conditions as the authority may deem most advantageous to its own interest. However, we are of the view that the statute does not contemplate that the authority should be deprived of the right to make an advantageous private sale of such bonds merely because of a failure to receive any bids in answer to such advertising; and we are therefore of the opinion that, where the authority has advertised for bids, as provided in the statute, and has received none in answer thereto, then and in that event it may, in a proper case and where it can be advantageously done, proceed to sell such bonds at private sale, under such terms and conditions as the authority may deem most advantageous to its own interest.

It appears that the contract with Allyn & Company for the sale of the refunding bonds was made solely by negotiations between the authority and Allyn & Company. It does not appear that any individual or con-

cern was consulted, or that any attempt was made to obtain bids for the purchase of the bonds. We are satisfied that the statute is mandatory, in so far as it provides that the authority must advertise in some manner for bids before any sale can be made, whether it be as therein provided for, to the highest and best bidder, or by private sale, as provided in the statute. As justifying our conclusion, we call attention to the first proviso in the portion of § 6524-8 quoted above, which is to the effect that the authority may reject all bids submitted. This language indicates to us that the legislature contemplated that bids would be called for pursuant to some sort of advertising, and an opportunity given for competitive bidding. The section also provides that the authority may sell bonds to the United States or any of its departments, agencies, or instrumentalities, and that such sale shall be subject to all the provisions of the act, *except* the requirement that the bonds be first offered at public sale pursuant to advertisement. This last proviso clearly recognizes the necessity for advertising, in all cases except where the bonds are sold to the United States or its agencies, etc.

Relator contends there was and is an emergency existing which justified negotiating privately for the sale of these bonds, and that the act is permissive and not mandatory. We have no doubt the authority acted in the utmost good faith, and it may be that, under the situation existing, no bids would have been received had the authority advertised for bids, but nevertheless we are firmly of the opinion that bonds, whether of an original issue or refunding bonds, may not, under the act, be sold until the authority has first advertised for bids.

It is finally contended that the statute has in fact been complied with relative to advertising.

Attached to the affidavit made in support of the application for the writ are copies of five articles printed in Seattle and Tacoma newspapers, between August 11 and August 15, 1940, all based apparently upon a United Press dispatch from Olympia. These articles state that the authority is studying plans to refinance the bridge revenue bonds by the issuance of new bonds bearing less interest and maturing in a shorter time. The articles appear to be nothing more than news items, and in no way do they suggest that the authority is about to call for bids upon the new bonds. These articles do not, in our opinion, meet the requirements of the statute relative to advertising.

While, as we have stated, the authority does have the implied power to issue and sell refunding revenue bonds, it can do so only in the manner provided by the statute.

In the instant case, the authority not having followed the procedure outlined in the statute, the sale of the refunding bonds to Allyn & Company was void, and the state auditor was justified in refusing to sign the bonds and in refusing to allow a facsimile of his signature to be attached to the coupons.

The writ must be and is denied.

BLAKE, C. J., MAIN, BEALS, MILLARD, STEINERT, ROBINSON, and DRIVER, JJ., concur.

SIMPSON, J., concurs in the result.