## 9013.   GREAT EASTERN CASUALTY CO. v.
## BLACKWELDER.

1. Where a contract of accident insurance, prepared by the insurer, contains a word susceptible of being construed, without violence, as having more than one meaning, the meaning most favorable to the interests of the insured and most unfavorable to the interests of the insurer must be given to it.

(a) This court will take judicial cognizance that it is the universal custom of insurance companies to prepare their contracts of insurance.

2. Under a contract of accident insurance which provides that the insurer will be liable if the insured is killed by "the collapse of a building," liability arises when the insured is killed by the collapse of any substantial portion of a building.

3. The word "building," in its legal sense, is ambiguous, and is susceptible of being construed, without violence, as including many different kinds of structures and edifices erected by man.

4. Keeping in view the rulings made in the preceding notes, the word "building," as used in the contract of limited accident insurance sued upon, included the structure, the collapse of a substantial portion of which caused the death of the insured.

DECIDED JANUARY 21, 1918.,

Action upon accident-insurance policy; from city court of Atlanta—Judge Reid. April 17, 1917.

. *Bryan, Jordan & Middlebrooks, W. R. Tichenor*, for plaintiff in error. *Little, Powell, Smith & Goldstein*, contra.

BROYLES, P. J. Mrs. Stella Blackwelder brought suit against the Great Eastern Casualty Company upon a policy of accident insurance issued by the defendant upon the life of her husband. This was not a general policy, but specifically limited the insurance to fourteen named contingencies. Only one of these is involved in the present case,—the 14th, which reads as follows: "By collapse of a building (except buildings in process of construction, repair or demolition)." Upon the trial there was no dispute that the structure in question was not in process of construction, repair, or demolition. The structure, by the collapse of which the insured was killed, was erected upon the bank of a river and adjoining a railroad track, in Floyd county, Georgia, and was used to unload sand from barges in the river and to load this sand in cars upon the railroad track. The foundation of the structure was of concrete, upon which was built a heavy wooden framework or trestle. This trestle consisted of six wooden uprights, 12 inches square and 12 to 15 feet in length. These wooden uprights were held to-

gether by wooden cross-braces, bolted to the uprights. Across the top of the trestle-work was affixed a floor, or platform, of strong timbers, about 2C or 25 feet square. On this platform and bolted to it were four steel I-beams. These I-beams were bolted together and formed a square box. Across each corner of this box were placed four braces which were bolted to the I-beams. On this box and braces was bolted a circular track of railroad iron. Inside of the railroad-iron track was affixed a circle of cogs; and inside of this circle of cogs were several steel beams which ran to the center of the circle. At the place where these beams joined there was a concave arrangement, like a wash-pan, called a "duck-nest." This duck-nest had in its center a hole about 2½ inches in diameter. On the circular railroad track there was a circle of wheels, the flanges of which were on the outside of the rail. These wheels were called a "floating circle," and came in sections of about four wheels each. These sections were bolted together. Above this floating-circle of wheels was constructed a second platform, made of steel and wooden beams, over which was a plank floor. On the bottom of this upper platform was attached a circle of railroad iron, the same size as the circle attached to the lower platform. This railroad-iron circle rested on the top of the wheels which formed the floating-circle. In the center of the upper circle of railroad-iron, which was attached to the bottom of the upper platform, was a convex arrangement like an inverted wash-pan, which fitted into the "duck-nest;" and through this convex arrangement was a hole similar in size to the one in the center of the "duck-nest." On top of this upper platform was an A-frame of strong timbers, to which was attached the necessary drums and pulleys. Attached to this upper or second platform was still another and smaller platform, about 3 by 3 feet in size, upon which the engineer stood to work the levers and raise or lower the "clamshell" bucket attached to the end of the boom, or to swing the bucket around to the place where he desired to unload it; and above this small platform was a small roof, to protect from the weather the engineer and the wooden drum on which the cable worked. From this roof there were canvas sides which could be rolled up or lowered as the engineer desired. Above the roof which sheltered the engineer, and attached to the A-frame was a box-like covering for the protection of the wooden drum. The upper platform and

the parts of the derrick thereon weighed about thirty tons. It was held·in place by its weight, forcing the convex arrangement on the bottom of the upper platform into the duck-nest on the lower platform, and by the flanges of the wheels of the floating-circle, which were on the outside of the circular rail track on both the upper and the lower platforms. In addition, through the hole in the center of the upper and lower platforms, there was placed a long bolt, called a "king-pin," and a nut or "key" secured the lower end of it, binding together the upper or revolving and the lower, or stationary, parts of the structure. The testimony is that it was not necessary to put this king-pin in, and that it was not customary to use such a pin in similar structures, but, in order to be doubly sure that the upper platform was securely fastened to the lower one, this king-pin was put in. The evidence is not altogether clear as to whether the king-pin was in place on the day of the accident.

The derrick which constituted the upper portion of this structure was a steam hoisting-derrick, or revolving crane, known as a McWyler "Whirley" derrick. This derrick belonged to Brewer & Jones, contractors and dealers in sand in Rome, Georgia; and Blackwelder was the engineer employed by them to operate the derrick. It was purchased, dismantled, in Cleveland, Ohio, and was shipped to and erected at the place where it collapsed (part of the timber used in its erection being bought at Rome, Georgia), and where it had been located for about three years prior to the accident.

How the accident occurred is not material in this case, but it was undisputed upon the trial that everything above the floating circle of wheels, including the second platform, the boom, the A-frame, the cables, the drums, the boiler, the engine, the water tank, and the coal box, fell or slipped off into the river, carrying Blackwelder with the wreckage, and killing him. Neither the floating·circle of wheels nor anything thereunder fell.

1. The rule as to the construction of ambiguous words in a contract of insurance, as stated in the first headnote, is so well known and recognized that we think it unnecessary to cite· authority in connection therewith. Although the evidence did not specifically show that the insurance contract sued upon was prepared by the insurer, it is so well known in the legal world that

it is the universal custom for insurance companies to prepare their contracts of insurance that this court will take judicial cognizance of that fact.

2. No citation of authority is deemed necessary to support the second headnote, as the principle of law stated therein is well settled.

3, 4. It is agreed by counsel for both parties that the only question for this court to decide is whether the structure described above was a "building," within the meaning of the contract of insurance sued upon. It is contended by the learned counsel for the plaintiff in error that this structure or fabric was merely a portable derrick, or piece of movable machinery, and could not reasonably be considered as a *building*. It is first necessary, therefore, to find out how the lexicographers have defined the word "building," and how the courts have construed it.

The Century Dictionary (copyright dates 1889 to 1911) gives the following definitions of the word: "A fabric built or constructed; a structure; an edifice; as commonly understood, a house for residence, business, or public use, or for shelter for animals or storage of goods. In law, anything erected by art and fixed upon or in the soil, composed of different pieces connected together, and designed for permanent use in the position in which it is so fixed, is a building. (Edw. Livingston.) Thus a pole fixed in the earth is not a building, but a fence or a wall is."

The Standard Dictionary (date 1913) defines it as "An edifice for any use; that which is built, as a dwelling-house, barn, etc.

"And think ye that *building* shall endure
Which shelters the noble and crushes the poor?"

From Webster's Dictionary (date 1909), we get the following definitions: "That which is built; specif: (a) as now generally used, a fabric or edifice, framed or constructed, designed to stand more or less permanently, and cover a space of land, for use as a dwelling, storage, shelter for beasts, or some other useful purpose. Building in this sense does not include a mere wall, fence, monument, boarding, or similar structure, though designed for permanent use where it stands; nor a steamboat, ship or other vessel of navigation. (b) As interpreted under some statutes, a part of a house occupied as a separate tenement; an apartment or tenement." According to Black's Law Dictionary a building is "A

structure or edifice erected by the hand of man, composed of natural materials, as stone or wood, and intended for use or convenience." And in Bouvier's Law Dictionary (Rawle's third revision, 1914), a building is defined as "An edifice erected by art, and fixed upon or over the soil, composed of brick, marble, wood, or other proper substance, connected together, and designed for use in the position in which it is so fixed. . ."

The learned counsel in this cause have not cited, nor have we been able to find, any case where it has been held that a structure substantially similar to the one here involved was, or was not, a "building," within the meaning of the contract of accident insurance which covered the death of the insured if caused by the "collapse of a building." It is clear, however, that the answer to the question involved in this case depends upon another question, to wit, is the word "building" ambiguous? Has it only one generally accepted and understood meaning, or has it more than one? To state the proposition more precisely, as applied to the facts of this case,—does the word "building" include only houses of a certain class, such as dwellings, stores, offices, barns, and structures of the same general character, or is it susceptible, without a violent interpretation, of being construed as including many kinds of edifices and structures erected by man, which are not of the same general character as dwellings, stores, offices, or barns? It appears from the definitions we have just quoted from the dictionaries that the word "building" embraces edifices and structures of many and varied character, for occupation, habitation, storage of goods, shelter, and *for other useful purposes.* There seems to be no single, restricted and well-accepted definition of the term. The books are, however, full of cases which supply the answer to the latter question. In Smart *v.* Hart, 75 Wis. 471 (44 N. W. 514), and Gillock *v.* People, 171 Ill. 307 (49 N. E. 712), it was held that a "chicken-house" was a building. In Whitmore *v.* Wenlock, 44 E. C. L. 15 (134 Eng. Reprints, 460), and in Smart *v.* Hart, supra, a "cow-house" or stable was declared to be a building. A "dug-out," 13 feet long, 10 feet wide and 7 feet deep, covered with a roof, was held to be a building, in State *v.* Sanders, 81 Kan. 836 (110 Pac. 1029). In State *v.* Anderson, 154 Iowa 701 (135 N. W. 405), a freight-car, resting on timbers on railroad ground, the trucks having been removed, was adjudged a

building. See, to the same effect, 1 Words & Phrases (2d series), 512; Hardin v. State, 92 Neb. 298 (138 N. W. 146). In Montclair v. Amend (N. J. Eq.), 68 Atl. 1067, it was held that a lunch wagon, located on a vacant lot, and connected with gas and telephone fixtures, was a building. In Watson v. Cotton, 57 E. C. L. 51 (136 Eng. Reprints, 792), a shed, closed on two sides, was declared a building. In Concord v. Morgan, 74 N. H. 32 (64 Atl. 725), it was held that the word "building" included a structure for the shelter of an engine and consisting of a roof composed of boards and roofing paper, supported by rows of posts, with walls made of boards and "piles of wood." In Olmsted v. McNall, 7 Blackf. (Ind.) 387, a floating wharf was held to be a building. In Coburg Hotel v. London County Council, 19 Cox C. C. 411, a "portico" was held to be a building. In Wood v. Cooper (1894), 3 Ch. 671, a "trelliswork screen" was held to be a building. A "wooden advertisement boarding" was held to be a building, in Pocock v. Gilham, Cab. & E. 104. In several jurisdictions it has been held that even a *fence* is a "building." Mecca Realty Co. v. Kellogg &c. Co., 166 App. Div. 74 (151 N. Y. Supp. 750); Swasey v. Shasta County, 141 Cal. 392 (74 Pac. 1031); Moore Planting Co. v. Morgan's La. &c. Co., 126 La. 840 (53 So. 22); Parsons v. New York, 107 App. Div. 324 (95 N. Y. S. 131); Wright v. Evans, 2 Abb. Pr. N. S. 308.

The case, however, which in its facts most nearly resembles the instant one is that of Aylward v. Matthews, 1 K. B. (1905) 343 (9 Corpus Juris, 686, note a). In that case the headnote says: "A temporary wooden structure of a substantial nature, such as a platform sixty-two feet in height, for a steam crane, to be used in the construction of a building, may be a building within the meaning of section 7 . . . of the workmen's compensation act, 1897." In that case the platform was being erected to support a steam-crane, which was to be used in the construction of a school building. The platform was made of wood and was supported by three legs, which were composed of upright pieces of timber, connected together with cross-braces of wood. These legs went down into the ground and were strengthened at the base with bricks or other heavy substances to keep them fixed. Upon the cross-pieces of the legs planks were placed, upon which ladders rested, thus forming a scaffolding by means of which the platform was being

erected. The platform was about sixty-two feet above the ground. It was intended as a temporary structure only, as it was to be torn down and removed when the school building was completed. Aylward, who was engaged in the erection of the platform, fell from a ladder forming a part of the scaffolding, in consequence of the breaking of a plank upon which the ladder rested, and sustained injuries for which he claimed compensation under the workmen's compensation act of 1897. That act provided for compensation, among other things, for injuries sustained by a workman while engaged in the erection or repair of a "building" exceeding thirty feet in height. The sole question in that case was, whether the platform was a "building," within the meaning of the act. Counsel for the respondent (the contractor and the employer of Aylward) contended that as the platform was only a temporary structure and was being built solely for the purpose of erecting a building, it could not itself be regarded as a building for the purposes of the act. The trial judge, however, held that it was a "building," within the meaning of the statute, and this decision was upheld by the King's Bench Division.

In our opinion there is decidedly more reason for holding that the structure in the case at bar was a building, within the meaning of the contract of accident insurance; for here the structure was much more substantial and permanent in its character, and the rule of construction is much more favorable to the insured. The fact that only the top part of the structure in question here fell, or collapsed, and that the lower platform and trestle remained standing, is, in our judgment, immaterial. The entire structure, taken as a whole, was necessary for the proper operation of the work being accomplished by it. If the top part, consisting of the derrick proper, had been removed from the lower part, the efficiency of the structure as to workability would have been destroyed. Either part would have been useless without the other. The structure then must be considered as a whole, and when so considered it is obvious that it is immaterial in this case whether the insured was killed by the collapse of the entire structure, or by the collapse of the top portion only. It is well settled that in cases of this character the insurance company is liable if the insured is accidentally killed by the collapse of a substantial portion of a building. It is not necessary for the plaintiff's recovery to show that the entire building collapsed.

Under all the facts of the case the court did not err in holding that the structure in question was a "building," within the meaning of the contract of insurance sued upon, or in directing a verdict in favor of the plaintiff.

*Judgment affirmed.* *Bloodworth and Harwell, JJ., concur.*