STATE *ex rel.* EDWARD F. HOLBERT

*v.*

ALBERT F. ROBINSON, *Mayor of the City of Fairmont*

(No. 10282)

Submitted May 23, 1950.  Decided June 6, 1950.

HAYMOND, JUDGE, not participating.

*Goodwin, Nesbitt, Spillers & Mead, Russell G. Nesbitt,* for petitioner.

*L. E. Johnson,* for respondent.

RILEY, JUDGE:

In this original proceeding in mandamus the petitioner, Edward F. Holbert, a property owner, taxpayer and resi-

dent of the City of Fairmont, a municipal corporation, in Marion County, West Virginia, in behalf of himself and all other persons similarly situated and interested, seeks to compel the defendant, Albert F. Robinson, Mayor of the City of Fairmont, to execute municipal public works revenue bonds in the principal amount of $175,000.00, authorized by that municipality by ordinance under Chapter 68, Acts of the Legislature, 1935, Regular Session, as amended, and to perform such other acts as may be requisite to carry out the provisions of the ordinance and to accomplish the issuance and the sale of the bonds. The ordinance became effective on May 13, 1950, and since that time the defendant has refused to execute the bonds, to perform any of the acts necessary to effectuate the purposes of the ordinance, or to recognize it as valid. After the refusal of the defendant to act under the ordinance, the petitioner, on May 16, 1950, instituted this proceeding in this Court. Upon the petition a rule was issued returnable before this Court on May 23, 1950. At that time the defendant appeared and filed his written demurrer, and this proceeding was submitted for decision upon the petition and the demurrer and the written briefs and the oral arguments of the attorneys for the respective parties.

Several months prior to May 1, 1950, the Board of Directors of the City of Fairmont, its governing body, determined to convert a narrow strip of valley land, known as Coal Run Hollow, adjoining the business district of the city, into a public automobile parking lot for the purpose of relieving the traffic congestion caused by the parking of automobiles on the streets of the city. To complete the project much grading, filling and surfacing of the land will be necessary but only a slight amount of building construction will be required. The only structure to be built in connection with the proposed facility is a passenger elevator to connect the parking lot with the street level of Fairmont Avenue, a main city thoroughfare, which passes over a bridge across Coal Run Hollow at an elevation of approximately 95 feet above the location of the lot. The cost of the proposed improvement, to be financed by an

issue of municipal public works revenue bonds bearing interest at the rate of 3-¾ per cent, will be $175,000.00.

On May 1, 1950, the city passed an ordinance entitled: "AN ORDINANCE making provisions for the issuance of $175,000 Parking Facilities Revenue Bonds of the City of Fairmont, West Virginia, for the purpose of defraying the cost of public automobile parking facilities for said city and providing for the operaton of the project on a self-supporting basis and for the collection, segregation and distribution of the income and revenues from such operation to pay the costs of operation and maintenance thereof and the interest and principal requirements for said bonds." After the passage of the ordinance it was published once each week for two successive weeks in two local newspapers and notice of a public hearing on May 13, 1950, at the city hall in Fairmont, was duly given. No protests by any owners of real estate in the city were made or filed at the hearing. The statutory procedural requirements in connection with the adoption of the plan and the enactment of the ordinance appear to have been complied with and no question of any irregularity or defect of that kind is involved in this proceeding.

The petitioner bases his right to a writ of mandamus to require the defendant to carry out the provisions of the ordinance on the theory that the city has the authority, under Chapter 68, Acts of the Legislature, 1935, Regular Session, as amended, to construct and maintain a public automobile parking lot equipped with an elevator for use in operating the improvement and to finance it as a municipal public works project by a bond issue to be paid for from the proceeds derived from its operation.

The defendant challenges the validity of the ordinance, and refuses to execute its provisions, on the ground that a public automobile parking lot on which only an elevator of the type proposed is built, is not an automobile parking building or a municipal public works project, within the meaning of the statute, and that an issue of municipal revenue bonds to finance it under the ordinance passed for that purpose is invalid.

These directly countervailing contentions involve the meaning and the effect of the applicable provisions of the statute which authorizes municipalities to construct and maintain municipal public works and to issue revenue bonds to defray the cost of such projects. The sole question for decision is whether a public automobile parking lot, equipped with a 95 foot elevator for use in its operation, is a municipal public works project within the meaning of Chapter 68, Acts of the Legislature, 1935, Regular Session, as amended.

The title to that statute, as originally enacted, is phrased in this language: "AN ACT to authorize municipalities to establish, construct, acquire, extend, own, operate, equip, maintain and improve municipal public works and to defray the cost of such construction, equipment, acquisition, extensions, and improvements by issuing revenue bonds, secured by and payable from the revenues of such systems; to authorize charges for the use of such municipal public works and to provide for the collection of same." The act, which contains twenty eight separate sections, sets out in detail the types of municipal public works, the manner of their construction and acquisition, the character and the effect of bonds issued to defray the cost of such works, the manner of authorizing, issuing and paying such bonds, and the powers and the duties of municipalities and municipal authorities under the statute.

Section 1 of the statute, as amended by Chapter 90, Acts of the Legislature, 1945, Regular Session, is couched in these words: " (a) The term 'municipality', as used in this act, shall be construed to mean any city or incorporated town in the State of West Virginia; (b) the term 'municipal authorities', as used in this act, shall be construed to mean the mayor and council, or similar governing body, board or commission of any city or incorporated town; (c) the term 'muncipal public works', as used in this act, shall be construed to mean and include cemeteries, incinerator plants, hospitals, piers, docks, terminals, airports, drainage systems, flood control systems, public markets, automobile parking buildings, stadiums, public recreation

parks, swimming pools, tennis courts, golf courses, polo grounds, public buildings, including libraries and museums, common jails, where such works or projects will be made self-supporting, and the construction and/or acquisition cost thereof, together with interest thereon, will be returned within a reasonable period, not exceeding thirty years, by means of tolls, fees, rents or charges other than taxation, and shall mean and include such system, building plant or project in its entirety, and all integral parts thereof."

Section 27 contains this provision: "This act being necessary for the public health, safety and welfare, shall be liberally construed to effectuate the purposes thereof."

From the foregoing provisions of the title and the statute, and other sections which need not be specifically mentioned or referred to, it is evident that the Legislature, in enacting it as a measure to promote public health, safety and welfare, intended it to have broad scope and wide application to public improvements beneficial to the public health, safety and welfare of municipalities in all sections of the State. The language defining municipal public works is comprehensive in character and covers such widely diversified general types as common jails, drainage systems, hospitals, golf courses and polo grounds. Some of the enumerated projects such as stadiums, libraries, museums, and public buildings, require the construction of substantial structures; others, such as golf courses and polo grounds, are not subject to that requirement in their ordinary use or operation. The broad and general character of the language used indicates that the Legislature intended it to apply to a plan, a development or a system in connection with a particular use or purpose and not to confine it strictly to the specifically enumerated project or work. The concluding words in Section 1 that municipal public works "shall mean and include such system, building plant or project in its entirety, and all integral parts thereof" support this view of the broad scope of that section of the statute.

If the word "buildings" in the phrase "automobile parking buildings" means "buildings" in its usual and ordinary sense, that meaning would restrict any municipal public works project, authorized by the statute, with respect to automobile parking, to automobile parking structures only and would exclude any other equally effective and necessary parking facilities from the scope of the statute, contrary to its express purpose of promoting the public health safety and welfare in authorizing municipal public works. If, however, the word "buildings", as used in association with other general words in Section 1 of the statute, and particularly with the modifying words "automobile parking", means facilities or improvements · to enable the municipality effectively to deal with or to solve the automobile parking problem in the interest of public safety, the scope of the act would extend to and include automobile parking projects and harmonize with the general purpose of the statute to authorize municipal public works to be used in connection with the automobile parking problem in the promotion of public safety, which is the obvious purpose of the statute in its entirety as applied to that class of municipal public works. The word "buildings", as used and associated with the words "automobile parking" and other general words in the context of Section 1 of the statute, in the light of its broad general purpose, is ambiguous and uncertain and calls for judicial interpretation of its meaning and effect in the proper application of the statute.

Though a parking "building", in the ordinary sense of the term and when used alone, is not a parking lot, and though the single word "buildings", as insisted by the defendant, when used in its usual and ordinary sense, has a meaning entirely different from the word "lot", it may, in association with other words, import a meaning other than that which it usually and ordinarily expresses or conveys. In general, a building means a structure or an edifice, covering a space of land, constructed and designed to exist permanently for use as a dwelling, storehouse, factory, shelter for beasts, or to serve some other useful purpose. Webster's New International Dictionary, Second

Edition, G. & C. Merriam Company, 1940, page 351; Black's Law Dictionary, Third Edition, pages 255, 256; *Great Eastern Casualty Company* v. *Blackwelder,* 21 Ga. App. 586, 94 S. E. 843. In the *Great Eastern Casualty Company* case the Court held that the word "building" in its legal sense is ambiguous, and that a derrick and the connected top portion of a structure was a "building" within the meaning of an accident insurance policy which covered "the collapse of a building". The words "building" and "improvement", by reason of the context in which they are used, may mean the same thing. *Lanier* v. *Lovett,* 25 Ariz. 54, 213 P. 391. The word "building" has been held to mean a dugout or an artificial cave, *State* v. *Clark,* 221 Mo. App. 893, 288 S. W. 77; a silo, *Bush* v. *Norman* (Mo. App.), 199 S. W. 721; a sign, *Mecca Realty Company* v. *Kellogg's Toasted Corn Flakes Company,* 151 N. Y. S. 750, 166 App. Div. 74; a box car, *State* v. *Lintner,* 19 S. D. 447, 104 N. W. 205; or a room or an apartment in a state capitol, *Adams* v. *State,* 13 Ala. App. 330, 69 So. 357. The term has been held to mean and include the land on which the building stands and adjacent land. *Thomas* v. *Long,* 182 Iowa 859, 166 N. W. 287. Many cases cited in *Great Eastern Casualty Company* v. *Blackwelder,* 21 Ga. App. 586, 94 S. E. 843, indicate the diverse meanings of the word "building" with respect to variant types of objects or structures.

By giving consideration to the use to be made of the projects mentioned in Section 1 of the statute and the purpose for which any of them is authorized, the words "automobile parking buildings" may properly be construed to mean an automobile parking system or facility and to embrace an automobile parking lot. An automobile parking building and an automobile parking lot are necessarily devoted to the same use and they accomplish the same general purpose. An automobile parking building furnishes more protection from the weather and other hazards for the automobiles parked within it than does an automobile parking lot, but it is usually less convenient in its use for that purpose than an open parking lot. A building used for parking purposes may also be relatively less capacious than an open lot devoted to the same use. But

aside from the relative advantages or disadvantages which the one may have over the other, each serves the same purpose and each is a facility devoted to the same use. In view of the purpose to be effectuated, it is clear that the Legislature did not intend to limit the meaning of the word "buildings" to that usually or ordinarily imported to it or to restrict accomplishment of a declared purpose of the statute of promoting the public safety, with respect to the parking of automobiles, to a parking building only. On the contrary, when the phrase "automobile parking buildings" is read in connection with and as a part of the section and with regard to the statute in its entirety, it is evident that the Legislature intended that phrase to mean automobile parking facilities or instrumentalities and to extend to and embrace an automobile parking lot as well as an automobile parking building.

Legislative intention is a cardinal rule of statutory construction and ascertainment of that intention involves consideration of the subject matter of the legislation, its purposes, objects and effects, in addition to its express terms. *Newhart* v. *Pennybacker,* 120 W. Va. 774, 200 S. E. 350, 200 S. E. 754; *Bluefield Supply Company* v. *Waugh,* 106 W. Va. 67, 145 S. E. 584. In the proper interpretation of a statute reference should be made to its subject matter and its purpose, and the statute in its entirety should be considered. *Bloyd* v. *Scroggins,* 123 W. Va. 241, 15 S. E. 2d 600. A statute is enacted as a whole with a general purpose and intent, and each part should be considered in connection with every other part to produce a harmonious whole and words and clauses must be read in a sense which harmonizes with the subject matter and the general purpose of the statute. The general intention is the key to the whole and the interpretation of the whole controls the interpretation of its parts. *Harbert* v. *The County Court of Harrison County,* 129 W. Va. 54, 39 S. E. 2d 177; 50 Am. Jur., Statutes, Section 352. In interpreting and applying a statute, intent and purpose of the Legislature in enacting it must be ascertained and given effect, *State ex rel. Cosner* v. *See,* 129 W. Va. 722, 42 S. E. 2d 31; and in so doing the court will consider the purpose for which

it was passed as well as the language employed. *Metropolitan Life Insurance Company* v. *Hill,* 115 W. Va. 515, 177 S. E. 188.

In construing an ambiguity in a statute, the title, though not a part of the act, may be examined as a means of ascertaining the purpose of the legislaton, *Miller* v. *Common-Wealth,* 180 Va. 36, 21 S. E. 2d 721, and as indicative of legislative intent in its enactment, *Krummert* v. *Commonwealth,* 186 Va. 581, 43 S. E. 2d 831; *Sauer* v. *Monroe,* 171 Va. 421, 199 S. E. 487; *C. I. T. Corporaton* v. *Guy,* 170 Va. 16, 195 S. E. 659; *Chambers* v. *Higgins,* 169 Va. 345, 193 S. E. 531. In liberally construing this identical statute and in holding that the requirement in Section 1 that a flood control system be paid for "by means of tolls, fees, rents, or charges other than taxation" meant that such system could be paid for by charges in the form of special assessments on real estate within the protected area, this Court looked to the title in determining the purpose of the statute. *The Duling Brothers Company* v. *The City of Huntington,* 120 W. Va. 85, 196 S. E. 552. In the opinion in that case this Court said: "The principal object of the Act was to authorize municipal public works. This object is clearly expressed, and being so, words descriptive of details ancillary thereto should not be narrowly defined." A liberal construction was given to another section of the act by this Court in *Warden* v. *The City of Grafton,* 125 W. Va. 658, 26 S. E. 2d 1, the opinion in which contains this language: "This liberal construction, to the end that the act may be workable, is directly required by the statute itself, which says: 'This act being necessary for the public health, safety and welfare, shall be liberally construed to effectuate the purpose thereof'. Section 27, Chapter 68, Acts of the Legislature, 1935." When a court is called upon to construe a statute, weight should be given to a directive or a statement of policy by the Legislature, but neither is controlling. It will be given consideration and effect as indicative of the legislative purpose and intent; but the courts, not the Legislature, exercise final authority in the construction of statutes. *State ex rel. Department of Un-*

*employment Compensaton* v. *Continental Casualty Company,* 130 W. Va. 147, 42 S. E. 2d 820.

In the light of the foregoing principles of statutory construction, and when read in connection with the statute as a whole and considered from the standpoint of the obvious general purpose of the Legislature in enacting it, the words "automobile parking buildings", properly interpreted and applied, by necessary implication mean not merely automobile parking buildings but automobile parking facilities devoted to and capable of accomplishing the same purpose in promoting the public safety, and as so interpreted and applied, extend to and include a public automobile parking lot.

As the proposed automobile parking lot is within the scope of the statute, and authorized by it, the bond issue and the ordinance which authorizes it are valid.

For the reasons stated the writ of mandamus, as prayed for in the petition, is awarded.

*Writ awarded.*