STATE *ex rel.* ALBERT B. KNIGHT

*v.*

JAMES H. HANWAY, MAYOR OF FAIRMONT, *etc.*

(No. 10410)

Submitted September 5, 1951. Decided October 23, 1951.

*Tusca Morris,* for relator.

*John L. McIntire,* for respondent.

GIVEN, JUDGE:

In this original proceeding in mandamus petitioner,

Albert B. Knight, a resident and taxpayer of the City of Fairmont, a municipal corporation, seeks to have the respondent, James H. Hanway, Mayor of Fairmont, execute revenue bonds in the amount of $3,500,000 for the construction of a toll bridge over the Monongahela River, within that city. Respondent demurred to the petition, and also filed an answer thereto. Petitioner filed his demurrer to the answer. The answer of respondent states: "That all allegations of fact contained in the said petition are true."

Material allegations of the petition are to the effect that the City of Fairmont, operating under a charter enacted by the Legislature of the State of West Virginia, by its board of directors, the legislative body of that city, on June 25, 1951, enacted an ordinance entitled: "An Ordinance providing for the construction, maintenance and operation of a highway toll bridge across the Monongahela River in the City of Fairmont, West Virginia, including approaches thereto; and for the acquisition of all necessary rights of way and of franchises: Authorizing the issuance and sale of bridge revenue bonds of the City of Fairmont in the amount of $3,500,000, payable solely out of the revenues of such bridge; for the purpose of paying the cost of said improvements, prescribing the details and other matters with respect to said bonds and the construction and operation of said bridge and providing for the rights of the holders of said bonds;" and that, as disclosed by said ordinance, said board of directors made certain findings, as follows:

"1. *Authority of this Ordinance*

"This Ordinance is enacted pursuant to the provisions of Chapter 27, Acts of the Legislature of West Virginia, Second Extraordinary Session, 1933, as amended, and other applicable provisions of law.

"2. *Findings*

"It is hereby found, determined and declared as follows:

"(a) That after a hearing and consideration by this Board of Directors it has been determined that it will be in the public interest and in the interest and welfare of the citizens of the City of Fairmont for the City of Fairmont to construct, maintain and operate a highway toll bridge and approaches thereto within the City of Fairmont for public use in travel, passage and transportation over and across the Monongahela River, a navigable stream, the eastern approach thereto including a viaduct over and across a deep ravine and Morgantown Avenue therein, from Diamond Street to East Park Avenue, in accordance with the plans and specifications heretofore made and prepared by Hazelet & Erdal, Consulting Engineers for the City of Fairmont.

"(b) That the Governor of the State of West Virginia has approved in writing the construction of the aforesaid highway toll bridge in accordance with the aforesaid plans and specifications.

"(c) That the State Road Commission of the State of West Virginia has approved in writing the construction of the aforesaid highway toll bridge in accordance with the aforesaid plans and specifications.

"(d) That the City has heretofore obtained the permit and license required to be obtained from the Federal Government by the laws of the United States prior to the construction of the aforesaid highway toll bridge across the Monongahela River as a navigable stream.

"(e) That the aforesaid highway toll bridge and approaches when constructed in accordance with the aforesaid plans and specifications will form a connecting link between two State highways.

"(f) That the aforesaid highway toll bridge when constructed in accordance with the aforesaid plans and specifications will provide a river crossing for a State highway;".

The petition further alleges that the bridge and its approaches "constitute one essential and inseparable link

for the connection between two State highways"; that the location of the bridge and approaches has been selected and determined in good faith by the proper authorities; that the bridge and approaches are necessary "for the public use, safety and welfare of the citizens of said City of Fairmont, and for the residents, property owners and taxpayers thereof"; and that the sum of $3,500,000 will be necessary for the construction of the proposed project.

It appears that the roadway over the proposed bridge will lead directly into Third Street on the westerly side of the river and directly into Diamond Street on the easterly side of the river. Diamond Street extends in the same general direction as the proposed bridge and intersects Morgantown Avenue at approximately five-tenths of a mile from the bridge structure, and crosses Morgantown Avenue to East Park Avenue. It is at the intersection of Diamond Street with Morgantown Avenue that the construction of a viaduct is contemplated. If the viaduct is constructed and Diamond Street is improved as contemplated, traffic may move over Diamond Street between East Park Avenue and the bridge in a straight line, avoiding a number of turns at street intersections, and will then connect two State highways. Other material facts will appear in the discussion of the questions raised by the pleadings.

Respondent admits that he has refused to sign the bonds. The propositions advanced by him as justifying such refusal, as disclosed by his demurrer and his brief filed herein, in so far as necessary to a discussion thereof, are: (1) That the provisions of the Code, hereinafter quoted, do not authorize or empower the city to construct the approaches to the bridge; (2) that the city is not authorized to improve by widening, paving and grading Diamond Street, or to construct the viaduct, and to pay for the same out of the proceeds received from the bonds; (3) that the city has no power or authority to condemn land in connection with the proposed improvement of Diamond Street, or the construction of the viaduct; (4)

that the city has no power or right to improve public streets, or to construct the viaduct, and pay for the same out of the proceeds of the bonds, for the use of the public, without requiring the payment of tolls therefor; and (5) that no authority exists in the city to cause or permit "a lien of any kind or character to be placed upon the said Diamond Street, or other streets, and the viaduct proposed to be constructed over said deep ravine and said Morgantown Avenue for the protection of the holders of said bridge revenue bonds issued under said ordinance."

The city claims power and authority to construct the bridge and issue the bonds by virtue of Chapter 27 of the Acts of the Legislature of 1933, Second Extraordinary Session, now Sections 30, 32 and 33 of Article 17, Chapter 17, of the Code. The material parts of Section 30 are:

"Any incorporated city, in which or adjoining which there is a portion of a navigable or non-navigable river or stream, * * *, is hereby authorized and empowered, in its corporate capacity, or through and by means of a bridge commission or other agency to be created or appointed by it, to construct, maintain and operate a highway toll bridge over and across such river or stream, from such a point within the corporate limits of such city, to such point on the opposite side of such river or stream, * * * as the said city, through its proper authorities, shall designate and select, for public use in travel, passage and transportation, over and across such river or stream: Provided, however, that no bridge shall be constructed, established or operated, over and across any navigable river, without compliance with the requirements, conditions and provisions provided by the Congress of the United States and the laws of the United States, nor without approval of the state road commission of this State; and such city is authorized and empowered to borrow money by means of bonds payable from revenues, or otherwise, and/or to accept grants in part payment therefor from the reconstruction finance corporation, public works administration or any other governmental agency authorized to make loans, a sum

of money sufficient and necessary to pay all costs of construction of such bridge, including approaches thereto, the acquisition of all necessary rights-of-way and all engineering, legal and other expenses necessary thereto or connected therewith, including interest during construction, as a self-liquidating enterprise or project, within the meaning of the federal laws authorizing loans by such reconstruction finance corporation, or other governmental agency. * * *."

Section 32 reads:

"Any city or county court authorized and empowered by this act to construct or purchase and maintain and operate such highway toll bridge, is further authorized and empowered to do and perform any and all acts and make all contracts necessary to effectuate the general purposes of this act, including the acquisition, by original grant, purchase, condemnation or other lawful means, of all necessary permits, franchises, licenses, rights-of-way, easements and other rights in real estate, and title to and possession thereof, and/or to make such purchase, with the money borrowed as provided in section one of this act, or otherwise. Such city or county court shall have authority to make such contracts, agreements and covenants between it and said reconstruction finance corporation, public works administration, or other governmental agency, for the loan of said funds and securing payment thereof, as they may be able to effectuate, subject only to this limitation, that the bonds or other evidences of indebtedness issued or given as security therefor shall be payable solely out of the revenues of such bridge; and to construct, own, operate and maintain such bridge over and across such river or stream, and to make and enter into such contracts, and to do and perform such acts as may be necessary to the construction, and/or purchase, ownership, operation and maintenance of such bridge, subject to such burdens, restrictions and encumbrances as it may be necessary to incur and bear, in securing such funds for construction, including the creation by mortgage or deed of trust, on the said bridge, its equip-

ment, tolls and revenues and franchise, and also subject to the laws of this State and the United States, relating to toll bridges over and across navigable streams, insofar as they are applicable to such bridges. Bonds, or other evidences of indebtedness, issued hereunder, shall be exempt from taxation by the State of West Virginia or any county, district or municipality thereof."

Section 33 reads:

"In the event bonds, or other evidences of indebtedness, issued under the provisions of this act, are not secured by a mortgage or deed of trust on the bridge acquired from the sale of such bonds, or other evidences of indebtedness, there shall be, and there is hereby, created a statutory mortgage lien upon the bridge and approaches so acquired or constructed from the proceeds of bonds, or other evidences of indebtedness, authorized to be issued, which shall exist in favor of the holder of said bonds, and each of them, and to and in favor of the holder of the coupons attached to said bonds, and such bridge and approaches thereto shall remain subject to such statutory mortgage lien until payment in full of the principal and interest of said bonds, or other evidences of indebtedness. Any holder of bonds, or other evidences of indebtedness, issued under the provisions of this act, or of any coupons representing interest accrued thereon, may, either at law or in equity, enforce the statutory mortgage lien hereby conferred, and may, by proper suit, compel the performance of the duties of the officials of the issuing municipality or county court set forth in this act. If there be default in the payment of the principal of and/or interest upon any of said bonds, or other evidences of indebtedness, any court having jurisdiction in any proper action may appoint a receiver to administer said bridge on behalf of the municipality or county court, with power to charge and collect rates sufficient to provide for the payment of said bonds, or other evidences of indebtedness, and interest thereon, and for the payment of the operating expenses and to

apply the income and revenues in conformity with this act and the order or ordinance providing for the issuance of said bonds, or other evidence of indebtedness."

Powers granted to the city by its present charter, Chapter 10, Acts of the Legislature, 1915, and Chapter 22, Acts of the Legislautre, 1919, include the power "to open, vacate, broaden, change grade of, and pave streets, sidewalks and gutters, for public use, * * *"; and to "construct and maintain bridges and retaining walls in any part of the said city, including the power to construct and maintain a bridge or bridges over and across the Monongahela river, the West Fork river or the Tygarts Valley river." Section 5 of the charter contains this provision: "* * * And when the board of directors determine that any real estate is necessary to be acquired by said city for any such purpose, or for any public purpose, the power of eminent domain is hereby conferred upon said city, and it shall have the right to institute condemnation proceedings against the owner thereof in the same manner, to the same extent and upon the same conditions as such power is conferred upon public corporations * * *."

It may be noted that respondent does not contend that there exists any material irregularity in the procedure before the board of directors of the City of Fairmont with reference to the adoption of the ordinance, or with the procedure whereby the project was approved by the State Road Commissioner, or the Governor of this State, or with the granting of the permit for the construction of the bridge over a navigable stream by the Federal government, and upon careful examination of the record we find no irregularity. It may also be noted that there is no denial that those who have acted in the planning, approval or adoption of the location of the bridge, and the approaches thereto, and the viaduct mentioned, have acted in good faith.

The power of the Legislature to confer upon municipalities authority to construct bridges and other public improvements is well established. *Meisel* v. *Tri-State*

*Airport Authority,* 135 W. Va. 528, 64 S. E. 2d 321; *State v. Robinson,* 134 W. Va. 524, 59 S. E. 2d 884; *Klostermeyer v. Charleston,* 130 W. Va. 490, 45 S. E. 2d 7, 175 A. L. R. 637; *Warden v. Grafton,* 125 W. Va. 658, 26 S. E. 2d 1; *Duling Bros. v. Huntington,* 120 W. Va. 85, 196 S. E. 552; *Brewer v. Point Pleasant,* 114 W. Va. 572, 172 S. E. 717; *Casto v. Ripley,* 114 W. Va. 668, 173 S. E. 886.

Here the contention seems to be that the power granted municipalities by Code, 17-17-30, while including the power to construct bridges does not include the power to provide for, or to construct approaches to a bridge. This contention seems to be based upon the fact that the word "approaches" is not included in the clause granting the city the power to construct, maintain and operate a highway toll bridge. We think there is no merit in the contention. By referring to the quoted part of the section it will be noted that the city is expressly authorized "to borrow money by means of bonds * * * to pay all costs of the construction of such bridge, including approaches thereto * * *." These provisions, read in *pari materia,* clearly show authority in the city to construct approaches to the bridge and to pay therefor out of revenue to be derived from the bonds. Approaches are a necessary part of the bridge and it would require plain language in such a statute to lead to the conclusion that the Legislature, in granting authority to a municipality to construct a bridge, did not intend that the power include the right to provide for and to construct approaches thereto. "The approach to a bridge is an essential and inseparable part of it. Furthermore, a public bridge is an essential part of a road, and the approaches to the bridge and the bridge itself are parts of the highway. Similarly, bridges are embraced within the term 'streets,' used in reference to streets of municipal corporations. And as a general proposition, bridges, constituting extensions of streets, or connecting streets, are to all intents and purposes part of such streets." 3 M. J., Bridges, Section 3.

The further contention is made, however, that the

proposed improvement of Diamond Street, a public way, and the construction of the viaduct, approximately one-half mile from the bridge structure, can not be deemed approaches to the bridge within the meaning of the quoted statutes. The petition discloses that the city employed competent engineers to survey, plan and recommend the location of the bridge, and the necessary approaches thereto; that these engineers, cooperating with engineers of the West Virginia State Road Commission, made such survey and recommended the location of the bridge and the construction of the approaches thereto, including the contemplated improvement of Diamond Street, and the construction of the viaduct, as being essential to and necessary for the proper handling of traffic over the bridge; and that the contemplated improvement of Diamond Street and the construction of the viaduct are necessary for the maximum efficiency in routing traffic, and for the best interest and welfare of the public. The public authorities having the duty of determining these matters have approved and adopted the recommendation, and we can not say that their action in so doing is improper; nor should we attempt to reappraise that action in the absence of a charge of *mala fides* or fraud.

Approaches to a bridge are not necessarily confined or limited by distances from the bridge structure. *State* v. *Yelle,* 197 Wash. 110, 84 P. 2d 688; *In the Matter of City of New York,* 174 N. Y. 26, 66 N. E. 584; 10 McQuillin, Municipal Corporations (3d Ed.) Section 30.07. In England a doctrine early existed requiring local authorities to construct, maintain and repair bridges. By statute, 22 Hen. 8, C. 5, S. 9, one charged with that duty was required to keep in proper repair the roadway on each side of the bridge for a distance of three hundred feet. Out of this situation grew the doctrine that approaches to a bridge extended no farther than three hundred feet from the bridge structure. Such doctrine has never been followed in this country. 4 R. C. L., Bridges, Section 2; 8 Am. Jur., Bridges, Section 3.

The bridge when constructed, and the approaches

thereto, will constitute parts of the public highway. *Cavender* v. *City of Charleston,* 62 W. Va. 654, 59 S. E. 732. Two State routes will be connected thereby and a continuous flow of vehicular traffic may be expected over the same. Much of the traffic will consist of vehicles of immense size and weight, requiring roads, bridges and approaches of modern design and construction. Therefore, it must be held that the Legislature, in using the word approaches, did not intend to give the word any ancient or restricted meaning, but intended it to include, in some cases, at least, what may have previously been defined as access ways. "An 'approach' has been defined as an access or a way, passage, or avenue by which a place may be approached, from an engineering standpoint the 'approaches' to a bridge comprise the necessary traffic arteries and adjustment thereof, to develop its maximum traffic capacity, and it has been judicially declared that the approaches to a bridge comprise the traffic arteries leading to the ends of the bridge proper and such adjustment of the alignments and grades of such arteries in the immediate vicinity of such ends as is necessary to afford the maximum convenience of access and render available to the public the entire capacity of the bridge proper. * * *." 11 C. J. S., Bridges (Section 1b). See *Howington* v. *Madison County,* 126 Ga. 699, 55 S. E. 941; *State* v. *Yelle,* 197 Wash. 110, 84 P. 688; *In the Matter of City of New York,* 174 N. Y. 26, 66 N. E. 584; and *Chicago* v. *Pittsburgh, Ft. W. & C. Railway Co.,* 247 Ill. 319, 93 N. E. 307.

What has been said, we believe, demonstrates that there is no merit in the contention of respondent that the city is without authority to improve Diamond Street and to construct the viaduct as contemplated. These having been determined to be necessary parts of, or reasonably necessary approaches to the bridge, the construction thereof is within the authority granted to the city and, being within such authority, the cost of such construction may be paid from revenue to be derived from bonds.

Having found that the contemplated improvement of

Diamond Street and the construction of the viaduct are essential to the successful promotion and operation of the project, and will constitute necessary and proper approaches to the bridge proper, we have no difficulty in reaching the conclusion that the city is vested with power to condemn such rights and properties as may be necessary to carry out the proposed improvements and construction. Section 32, quoted above, reveals intent of the Legislature to authorize the municipality "* * * to do and perform any and all acts and make all contracts necessary to effectuate the general purpose of this act, including the acquisition, by * * * condemnation or other lawful means, * * * rights-of-way, easements and other rights in real estate, and title to and possession thereof, * * *." Power is also vested in the City of Fairmont, by virtue of the quoted provisions of its charter, to condemn real estate for the purpose of broadening, changing grade of, paving and otherwise improving its streets.

Respondent further contends that the city has no legal right to improve Diamond Street, or to construct the viaduct, and pay for the same out of revenues to be derived from bonds, without requiring a toll from those who may use the improved street, or the viaduct, without crossing the bridge. We do not agree. Diamond Street and Morgantown Avenue, as they now exist, are public ways, and they will remain public ways when improved as contemplated. They will be subject to use by the public after improvement to the same extent as they now are. Also, they will constitute necessary ways or approaches to the bridge, without which the bridge would be less useful and less revenue therefrom would be earned. Therefore, since the proposed improvements are primarily for the use of traffic expected to use the bridge and to increase the earnings of the bridge, thereby benefiting the bondholders, it is proper and just that the cost of such improvements be paid from revenues derived from the bonds. No denial of any right, and no inequity, result to respondent, the city, or any property owner. Of course, if any additional easement or other right in

real estate is obtained by the city, it must pay just compensation therefor, and if any property owner suffers injury because of the change of grade of a public way he will have an adequate remedy. There is no contention that any public street will be closed or rendered less accessible by the completion of the proposed improvement of Diamond Street or by the construction of the viaduct. A property owner or taxpayer can not be heard to complain of the improvements simply because the payment therefor is made by another. In such circumstances he is not injured, but benefited.

The only other complaint of petitioner which we are required to consider relates to the power of the city to "cause or permit a lien of any kind or character to be placed upon said Diamond Street, and the viaduct proposed to be constructed". Provisions in Section 32, quoted above, expressly provide that a municipality may secure the payment of funds obtained for the construction of such a bridge "by mortgage or deed of trust, on the said bridge, its equipment, tolls and revenues and franchise * * *"; and in the event the payment of such funds is not so secured, Section 33, also quoted above, expressly creates a "statutory mortgage lien upon the bridge and approaches so acquired or constructed from the proceeds of bonds * * *". Thus, authority to cause or permit the lien is clearly and unequivocally vested in the city. That the Legislature has power to so legislate can not now be doubted. *State* v. *Robinson,* 135 W. Va. 524, 59 S. E. 2d 884; *Klostermeyer* v. *Charleston,* 130 W. Va. 490, 45 S. E. 2d 7, 175 A. L. R. 637; *Warden* v. *Grafton,* 125 W. Va. 658, 26 S. E. 2d 1; *Duling Bros.* v. *Huntington,* 120 W. Va. 85, 196 S. E. 552; *Brewer* v. *Point Pleasant,* 114 W. Va. 572, 172 S. E. 717; *Casto* v. *Ripley,* 114 W. Va. 668, 173 S. E. 886. It may be noted, however, that the lien authorized by Section 32 may include or affect only the "bridge, its equipment, tolls and revenues and franchise * * *", and that the statutory mortgage lien created by Section 33 shall be only "upon the bridge and approaches so acquired or constructed from the proceeds" of the bonds.

It is clear, therefore, that the lien proposed in the instant case will not cover or include any part of Diamond Street, or any other public way, as it now exists. It is not contended that the statute here authorizes the City of Fairmont to create a lien upon any public way as the same now exists, but only upon the bridge and approaches "acquired or constructed from the proceeds" of the bonds to be issued.

It may also be pointed out that the authority granted a municipality by the statutes does no violence to the provisions of Section 8, Article X of the Constitution. In *Warden* v. *Grafton, supra,* Point 1, syllabus, this Court held: " 'Revenue bonds' issued by a municipality in conformity with Chapter 68 of the Acts of the Legislature of 1935, are not an indebtedness of the municipality under either Section 8 of Article X of the Constitution or under Code, 13-1-3." See *Casto* v. *Town of Ripley, supra; Brewer* v. *City of Point Pleasant, supra;* 38 Am. Jur., Municipal Corporations, Section 473. We think the same rule applies to the statute under consideration here. There is disclosed a clear intent to require that the payment of bonds be made from tolls or income derived from the project to be constructed. The city can not be made liable therefor in any other manner. The statute provides that the bonds "issued or given as security therefor shall be payable solely out of the revenues of such bridge", and each bond contains a provision to the effect that "the City of Fairmont shall not be obligated to pay this bond or the interest thereon except from the net revenues of said bridge as provided in said ordinance. The credit or taxing power of said City shall not be deemed to be pledged to, nor shall a tax ever be levied for, the payment of the principal or of interest on this Bond."

Having concluded that the proposed construction is within the authority granted the municipality, that the issuance of the bonds is clearly authorized for the purposes indicated, in the manner indicated, and that the proceedings adopting and approving the same are regular

and valid, we hold that it is the plain duty of respondent to execute the bonds. Therefore, the peremptory writ prayed for is awarded.

*Writ awarded.*